**ROSEMOUNT INC., Plaintiff,**

v.

**BECKMAN INSTRUMENTS, INC., Defendant.**

### No. CV 78–2616–LEW(Mx).

United States District Court, C.D. California.

Feb. 1, 1983.

otherwise. In *Northern Pipeline, supra,* 458 U.S. at 63, 102 S.Ct. at 2867, the Supreme Court discusses territorial courts, and recognizes congressional authority to grant them jurisdiction over matters usually reserved only to Article III courts.

John F. Flannery, Fitch, Even, Tabin, Flannery & Welsh, Chicago, Ill., for plaintiff.

Walton Eugene Tinsley, Harris, Kern, Wallen & Tinsley, Los Angeles, Cal., for defendant.

## MEMORANDUM OF DECISION

LAUGHLIN E. WATERS, District Judge.

This is a patent infringement action. The parties are: Rosemount Inc. (Rosemount), plaintiff, and Beckman Instruments, Inc. (Beckman), defendant. Rosemount, the holder of Patent No. 3,440,525 (Cardeiro Patent), charges that the Cardeiro Patent is valid, and Beckman has infringed the patent. Beckman responded by counterclaiming for a declaratory judgment that the Cardeiro Patent is invalid and not infringed.

Jurisdiction is found under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.* (1976), and jurisdiction is conferred under 28 U.S.C. § 1338(a) (1976).

Under the Cardeiro Patent, Rosemount manufactured and sold pH meters which were used for the purpose of determining the pH of a variable solution used in manufacturing and commercial applications. Beckman, after April 22, 1969, the date of the issuance of the letters patent for the Cardeiro Patent, manufactured and sold pH meters Model Nos. 940A, 960A, 940B, 940BF, 941A, 980 and 8700 with Electrode Station Part No. 637400, including Dome

Assembly Part No. 636280, 637420, 637403, 637406, 637410, 637430, 637404 or 637407. These models included an amplifier incorporated in a dome assembly and also included a pH sensitive electrode.

The issues of fact on the question of infringement are:

Whether the Beckman Model Nos. 940A/941A and 8700 series infringed Claims 1–3, 8 and 12–15 (Claims 13, 14 and 15 were withdrawn during trial) of Patent No. 3,440,525; and

Whether Rosemount is subject to file wrapper estoppel on Patent No. 3,440,525.

The issues of fact on the question of validity are:

Whether Claims 1–3, 8 and 12 of Patent No. 3,440,525 are anticipated under 35 U.S.C. §§ 102, 102(b), 102(e), 102(f) and 102(g) (1976);

Whether Claims 1–3, 8 and 12 of Patent No. 3,440,525 are obvious under 35 U.S.C. § 103 (1976) in view of the scope and content of the prior art, the differences between the claimed subject matter and the prior art, and the level of the ordinary skill in the pertinent art, and the level of ordinary skill in the pertinent art at the time the invention was made;

Whether Patent No. 3,440,525 was a commercial success;

Whether there was a long-felt need for an industrial control pH meter which would perform significantly more reliably than earlier models under the stress caused by industrial usage;

Whether there was commercial acquiescence in the validity of Patent No. 3,440,-525;

Whether Claims 1–3, 8 and 12 of Patent No. 3,440,525 are invalid for indefiniteness under 35 U.S.C. § 112 (1976); and

Whether Patent No. 3,440,525 is invalid for an incorrect naming of inventor.

The issues of fact on the question of enforceability are:

Whether, during the prosecution of the application which issued as Patent No. 3,440,525, the patentee fraudulently concealed from the Patent Office alleged material prior act known to plaintiff, its predecessor and/or applicant Cardeiro including the articles by Zimmerli (i.e., "An all Solid State pH Meter" and "Solid State pH Meter"), the Siliconix notes and the Cameron Patent; and whether Patent No. 3,400,525 would have issued had the existence of the publications been disclosed; and

Whether plaintiff's continued prosecution of this action constitutes unclean hands rendering the patent-in-suit unenforceable because plaintiff had been informed by defendant 1) that plaintiff's patent application had failed to include defendant's prior art; 2) that plaintiff's licensing practices were wrongful; and 3) that plaintiff's inclusion of the large porous plug in the patent application incorrectly designated Cardeiro as the inventor.

The issue of fact on the question of damages is:

Whether the infringement by Beckman was willful and wanton.

*History*

While pH sensors have long been available, their most effective and accurate use has largely been confined to laboratory work. Industrial and commercial applications, however, were more demanding because of varied temperature ranges, high humidity and corrosive fumes. Repackaged laboratory instruments used in industrial applications were subject to continuous drift, ground loops, signal pick-up and other noise interference and had to be monitored continuously and recalibrated as often as once every eight hours.

Because of the deficiencies of these repackaged laboratory instruments, efforts were made by a number of manufacturers to develop a system for measuring or automatically controlling the pH meter of a process solution in an industrial application.

Rosemount, as the result of a contract with Pacific Telephone Company, commenced work on such a system in late 1964. Beckman, which was then dominant in the field (Beckman's Model J was widely used),

initiated a product improvement program in 1968 for its pH meter in order to include all solid-state circuitry and provide an intrinsically safe circuit design, reduced size and lower manufacturing costs. Beckman also developed a pH sensor which was sold to the United States Government-NASA to be used in a space vehicle. While the contract was completed, this model was not used for its intended purpose.

Technology had made significant and dramatic improvements in various components used in the manufacture of pH sensors, such as solid-state circuitry, and some of these improvements now made certain changes technically feasible. Until the development of the Cardeiro Patent, however, the problem of developing a stable pH process meter eluded the innovators.

Cardeiro, contrary to what was the then accepted teaching in the art, concluded drift could be minimized if an input amplifier having a leakage current which doubled for about the same temperature change (i.e., 6°C.–7°C. increase) was directly connected to the glass electrode and if the input amplifier was exposed to substantially the same temperature variations as the glass electrode. Cardeiro experimented with the new technology and found that a junction field effect transistor (FET) (as distinguished from an "insulated gate" FET) having its gate electrode directly connected to the internal conductor of the glass electrode and mounted in close proximity to the glass electrode provided the solution to the problem of the calibration drift.

Cardeiro sold its patent rights to Rosemount. The Cardeiro pH sensor was quickly accepted by industry; Rosemount's sales increased to $10,000,000 within 10 years, and the number of employees increased from 5 to 170. Rosemount became the dominant supplier of pH meters and licensed a number of other companies to manufacture the Cardeiro process pH meters. Beckman remained the only major manufacturer who was not licensed.

Beckman, receiving glowing reports about the Cardeiro pH sensor and noting a growing loss of business to Rosemount, continued with its own product improvement program. In 1968, after investigating several other design approaches, Beckman developed a pH meter employing the Cardeiro concept which it then modified after the issuance of the Cardeiro Patent '525 on April 22, 1969. It was not until 1973, however, after continuing to lose business to Rosemount, that Beckman produced the Model Nos. 940A/941A series, which are the subject of this litigation.

### Discussion

A. Validity of the '525 Patent:

Under 35 U.S.C. § 282 (1976), a patent is presumed to be valid and the burden is on the party asserting invalidity to clearly demonstrate the invalidity. In *Santa Fe-Pomeroy, Inc. v. P & Z Co.,* 569 F.2d 1084, 1091 (1978), the Ninth Circuit stated, "[t]he statutory presumption means that 'patentees are heavily favored as a class of litigants'. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 335, 91 S.Ct. 1434, 1446, 28 L.Ed.2d 788 (1971). The presumption of validity is rebuttable only by 'clear and convincing evidence'. *Saf-Gard Product, Inc. v. Service Parts, Inc.,* 532 F.2d 1266, 1271 (9 Cir.1976) [*sic*]."

To carry its burden, Beckman has advanced a number of asserted deficiencies against the '525 Patent.

1) *Anticipation*

"Anticipation," under 35 U.S.C. § 102(a) *et seq.* (1976), may render a patent invalid. To prevail under these provisions, Beckman must demonstrate that all of the elements of claims in issue can be found in a previously known or described device in exactly the same situation and united in the same way to perform the identical function. *Stauffer v. Slenderella Sys. Inc.,* 254 F.2d 127 (9th Cir.1957), *quoted with approval in Saf-Gard Products, Inc. v. Service Parts, Inc.,* 532 F.2d 1266, 1270 (9th Cir.), *cert. denied,* 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179 (1976). While the defendant may have abandoned this defense, it ap-

pears and the Court finds that there was no evidence to support this defense.

### 2) *Obviousness*

■ A patent may be rendered invalid by reason of obviousness pursuant to 35 U.S.C. § 103 (1976). The Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) laid down the standard against which the defense of obviousness must be measured. According to the Court, "[u]nder Section 103, the scope and content of prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Id.* at 17, 86 S.Ct. at 693.

Beckman primarily relied upon a review of prior art as discussed by its expert, Dr. Fred C. Anson, referring to the Cameron Patent (Defendant's Exhibit P [hereinafter "Dx"]), the 1963 Zimmerli articles (Dx Q, S) and the 1964 Fein article (Dx R). Cardeiro, in his testimony, was also thoroughly examined and cross-examined on these exhibits.

■ The Court rejects Beckman's argument that the '525 Patent, rather than being an invention, is simply an advance in the logical improvement and development of an existing device. Beckman argues that the '525 Patent consists entirely of the application of improved technology in the fields which supplied the constituent parts that were adapted to the Cardeiro pH sensor. This argument overlooks the fact of a long-felt and unfulfilled industrial need for such a device. There was no showing that the solution could have been achieved by reliance upon then-existing state-of-the-art components and the evidence is to the contrary in light of the diligent and persistent efforts of others, including Beckman, to solve the problem. This argument also overlooks the evidence that Cardeiro deviated from the then accepted teaching in order to reach his solution. Additionally, there was testimony by Cardeiro that a number of the positive results were unexpected.

(Trial Transcript 333–334 [hereinafter "Tr."]). For such results to be unexpected by one skilled in art, they could not, at the same time, also be obvious. In short, it is the opinion of the Court that there were significant differences in construction, in application and in operation in the designs discussed in the Cameron, Zimmerli and Fein Exhibits which foreclose the conclusion that the '525 Patent is invalid by reason of obviousness. Defendant has failed to carry its burden of proof on this issue.

### 3) *Indefiniteness*

Beckman also contends that the '525 Patent is "fatally indefinite" and, therefore, invalid under the provisions of 35 U.S.C. § 112 (1976). Beckman urges that this "section requires that the specification for a patent shall contain a written description of the invention in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the invention, shall set forth the best mode contemplated by the inventor for carrying out his invention, and shall include one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." Defendant's Post Trial Briefs, p. 30.

■ First, Beckman argues that several claims contain overly vague language and the patent is, therefore, invalid. Beckman notes: 1) that Claim 1 reads in part "and *in close proximity to* said high impedance" (emphasis added); 2) that Claim 3 reads in part "*adjacent* to the pH sensitive electrode" (emphasis added); and 3) that Claim 12 reads in part "and *in close proximity with* the insulating member" (emphasis added). In addition, Beckman notes that such words as "substantially" (Claim 2), "short" (Claim 6—not in issue), and "substantial" and "numerous" (Claim 5—not in issue) also appear in the language of the patent. Beckman demonstrated during cross-examination that these terms were

not defined in the patent. Accordingly, Beckman urges that this absence of precise definition renders the patent fatally indefinite.[1]

1. A comparison of the claims of the Cardeiro Patent with the offending meters reveals the following: Claim 1 reads element for element on the accused pH meters as follows:

| Claim 1 | Infringing pH Meters Model 940A/941A Family |
|---|---|
| A system for determining the pH of a variable solution comprising: | The model 940A/941A is used to measure the Ph of a variable solution (R147–9) pH electrode (R 149, 817; PX 204 p. 110) Hemispherical tip at lower end of glass electrode (R149; PX 171; PX 204 pp. 110–1) |
| pH sensitive electrode, including | |
| a high impedance material responsive to the hydrogen ion activity of the variable solution and an internal electrical conductor for generating a voltage at said internal conductor indicative of the pH of the variable solution; and | Wire that extends from terminal into glass body of pH electrode (R 150; PX 204 p. 111) |
| a DC amplifier circuit for developing a signal as a function of the voltage developed on said internal conductor, said circuit including | DC amplifier AR1, AR2, AR2A and AR2B (R 150, 818, 821; PX 159) |
| a preamplifier stage having a field effect transistor mounted with said electrode and in close proximity to said high impedance material and with its gate terminal connected to said internal conductor to provide a low impedance signal output from its output terminals for transmission to a remote circuit responsive to said low impedance signal output for indicating the pH of the variable solution. | First stage of AR1 is junction field effect transistor (R 150–1, 818; PX 204 pp. 112–3). Gate terminal of junction field effect transistor at input of AR1 is connected to pH electrode (R 818; PX 62, 26). Junction field effect transistor is mounted in dome of electrode station (R 151, 821; PX 171) which includes the pH electrode having the high impedance material. This is close proximity (PX 204 pp. 114–5). The output of AR1 is a low impedance signal that is transmitted to a remote location (R 152–3; PX 204 pp. 114–5). |

Dependent Claims 2, 3 and 8 read on the accused pH meters as follows:

| Claim 2 | Infringing pH Meters Model 940A/941A Family |
|---|---|
| The system of claim 1 wherein: said field effect transistor is disposed in a heat exchange relationship with said high impedance material that subjects both said field effect transistor and said high impedance material to substantially the same temperature variations. | Field effect transistor in AR1 being mounted in dome is in heat exchange relationship with the glass membrane (R 153–5). |

| Claim 3 | |
|---|---|
| The system of claim 2 further comprising: | Electrode station (PX 171) which includes pH sensitive electrode and AR1 potted in dome, AR1 including the field effect transistor (R 155). Beckman admitted that the internal conductor is connected to the gate terminal of the field effect transistor (R 446). |
| a probe structure engaging said pH sensitive electrode, said field effect transistor being disposed within said probe structure adjacent the pH sensitive electrode, and one end of said internal conductor being connected directly to the gate terminal of said field effect transistor. | |

| Claim 8 | |
|---|---|
| The system of claim 1 wherein: said field effect transistor is operated with its drain-to-source bias current at the level where the gain characteristic is independent of temperature variation over an ambient temperature range. | The circuit for AR1 (PX 62, 26) shows that the drain-to-source is at such a level (R 156–160). |

The Court declines to accept this argument and does not believe that *Duff-Norton Co. v. Ratcliff*, 362 F.2d 551, 553 (9th Cir.1966) compels a contrary conclusion. To accept Beckman's contention would turn the construction of a patent into a mere semantic quibble that serves no useful purpose. The test to be applied is whether the language is set out with such precision as to enable one skilled in the art to make and use the invention. *U.S. Philips Corp. v. National Micronetics, Inc.*, 410 F.Supp. 449, 455 (S.D.N.Y.1976) (citing cases), *aff'd*, 550 F.2d 716 (2d Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977). Cardeiro testified that one so skilled would readily understand any particular language of the patent particularly when read in the context of the entire patent application. (Tr. 358, 415). The Court accepts the testimony of Cardeiro on this point. The language of the patent application is sufficiently definite to satisfy Section 112.

Second, Beckman contends that the patent application failed to satisfy Section 112 because Cardeiro failed to reveal the best mode of practicing the invention thus compelling the public to experiment rather than teaching the public how to properly apply the invention. *General Electric Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 368—

---

Claim 12 reads on the accused pH meters as follows:

| Claim 12 | Infringing pH Meters Model 940A/941A Family |
|---|---|
| In a system for measuring the pH of a circulating solution, an arrangement comprising: | The circulating solution around the end of the electrode station (R 161) |
| a pH sensitive electrode including | Glass-bodied structure in PX 171 (R 161; PX 204 p. 110) |
| a material responsive to the hydrogen ion activity of the circulating solution for developing a voltage indicative thereof, | Hemispherical tip of pH sensitive electrode (R 161; PX 204 pp. 110–1). |
| a hollow insulating member mounting said material for immersion in said circulating solution, | Glass body of the electrode, the lower end of which protrudes into the sample area (R 161) |
| an internal conductor, and | Wire in glass electrode (R 161–2; PX 204 p. 111) |
| a salt bridge solution contained within the hollow insulating member for establishing electrolytic contact between said material and said internal conductor; and | Sale bridge solution contained in glass electrode (R 162) |
| an amplifier circuit responsive to the voltage on said internal conductor, said amplifier circuit | Amplifier in dome shown in PX 171 and also within dotted outline of PX 159 (R162–3) |
| having a field effect transistor attached to and in close proximity with the insulating member and having its gate electrode connected to said internal conductor and its source and drain terminals connected to provide a low impedance signal indicative of the pH of the circulating solution for transmission to a remote location. | Beckman admitted that the amplifier circuit had a field effect transistor having its gate electrode connected to the internal conductor of the glass electrode (R 446). The amplifier is in the dome and is in close proximity with the glass membrance (R 165; PX 205 pp. 114–5). The low impedance signal is provided at the source and drain terminals for transmission to a remote location (R 166; PX 204 p. 115). |

375, 58 S.Ct. 899, 901–04, 82 L.Ed. 1402 (1938). Cardeiro responded that the patent reflected the best mode then known and that one skilled in the art would have no problem in practicing the invention. The Court accepts this testimony. Beckman's second argument on indefiniteness is thus rejected as well.

### 4) *Incorrect Inventor*

Beckman contends that Rosemount's patent is invalid because the patent application failed to name the correct inventor of at least part of the patented invention. Beckman points to 35 U.S.C. § 102(f) (1976) which provides that a person shall be entitled to a patent unless he did not invent the subject matter sought to be patented. The patent in suit discloses and claims two features, both separately and in conjunction with one another. One is the electrode with FET, Claims 1, 2, 3, 4, 8, 12, 13, 14 and 15 (Claims 13, 14 and 15 have been withdrawn), and the other is the reference half-cell or reference electrode with liquid junction having a large diameter plug, Claims 9, 10 and 11. The electrode and plug together are claimed in 5, 6 and 7. The use of the reference electrode with a wooden or ceramic plug is an important aspect of the invention covered in the patent (Tr.196). Beckman contends that Rosemount has been incorrectly designated as the inventor of the porous plug when in fact Robert Thomas invented this aspect. Accordingly, Beckman argues that the patent is invalid.

Cardeiro testified that in the development of the sensor, one of his co-workers, Robert Thomas, was the experimenter in the development of the liquid plug. Cardeiro conceived the idea for the plug and the idea for its substance. Moreover, Cardeiro made the first purchase of a wood dowel to be used for this purpose. (Tr. 133 and 134). Therefore, the Court finds that the inventorship of the patent in suit was correctly identified as Cardeiro instead of Thomas.

### 5) *Fraud on Patent Office—Failure to Properly Reference Prior Art*

Beckman contends that Rosemount defrauded the Patent Office by failing to properly reference prior art in its application for the Cardeiro patent. The prior art relied upon by Beckman has been discussed above. The Court finds that the Cameron Patent was presumptively reviewed by the examiner and that the Zimmerli and Fein Articles are no more pertinent than the prior art that was cited to the Patent Office. There was no fraud on the Patent Office.

In conclusion, Defendant failed to carry its burden of proof in demonstrating the alleged invalidity of the Cardeiro Patent.

### B. *Infringement*

Rosemount has charged that Beckman has infringed Claims 1–3, 8 and 12 of the Cardeiro Patent. Claims 1 and 12 are independent claims, while Claims 2, 3 and 8 are dependent on Claim 1.

As an initial step in determining infringement, it must first be determined whether the words of the claims literally described the pH meter in question. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). If the accused pH meter falls within the literal words of the claim, it infringes unless it performs in a substantially different way.

As to the second requirement above, the Court finds that the offending meter does not perform its function in a substantially different way, and, therefore, the question of infringement hinges essentially on whether the accused pH meter falls within the literal words of the claims.

Beckman points out several asserted differences between their product and that produced by Rosemount. As to Claim 1, Beckman delineates that each Beckman meter

> [d]oes not have an amplifier circuit having a field effect transistor mounted with the electrode or in close proximity with the electrode material and does not have a field effect transistor with its output terminals transmitting a signal to a remote circuit and does not have a leakage current which doubles with every 6° to 7°C. increase in temperature.

Defendant's Memorandum of Contentions of Law, p. 23.

As to Claim 12, Beckman asserts a similar position but adds that the field effect transistor does not have "its source and drain terminals connected to provide a low impedance signal for transmission to a remote location. . . ." Defendant's Memorandum of Contentions of Law, p. 24.

Neither Claim 1 or 12 is limited, however, to a field effect transistor having "a leakage current which doubles with every 6° to 7°C. increase in temperature." In any event, the Beckman FET, like all junction FETs, has this characteristic. (Tr. 1093–4, 1108–9, 1129–30, 1132–33, Plaintiff's Exhibit 62, p. 45 [hereinafter "Px"]).

As to the remaining noninfringement contentions of Beckman, as shown in the drawing of the electrode station of the Beckman pH meter (Px 171), the FET is mounted physically within the upper end or dome of the electrode station which contains the electrode. The FET is, therefore, mounted in close proximity to the high impedance material of the electrode (Tr. 150). Beckman refers to this mounting as being in "close proximity" (Px 204, pp. 114–5).

■ The arguments of plaintiff on this point, which are subsequently quoted, are adopted by this Court. Therefore, the Court holds that there was infringement in the present case.

The output of the entire amplifier circuit of the Beckman pH meter (PX 159) is a low impedance output signal that is transmitted to a remote circuit (R 152–3, 651). . . . The output from the field effect transistor in the input amplifier circuit, which is taken across its source and drain terminals, is a low impedance signal that is transmitted to a remote location (R 152–3, 165–6; PX 204 pp. 114–5). The addition of extra amplifying means in the amplifier circuit between the output of the field effect transistor and the output of the entire amplifier circuit is not excluded by the claims and does not avoid infringement of the Cardeiro patent.

With respect to Claim 2, which is dependent on Claim 1, Beckman contends that its pH meters do not infringe because, in addition to the non-infringement contentions with respect to Claim 1, Beckman's pH meters do not "subject both a field effect transistor and the electrode material to substantially the same temperature variations". The evidence at trial showed that the field effect transistor was mounted in the dome of the electrode station and that this was in heat exchange relationship with the glass membrane (R 153–5).

Beckman's non-infringement contentions with respect to dependent Claim 3 are, in addition to the contentions with respect to Claims 1 and 2, that Beckman's pH meters do not "have a field effect transistor disposed within a pH sensitive probe structure". The evidence at trial showed that the field effect transistor was mounted in the dome of the electrode station which is the electrode probe structure (R 155).

With respect to dependent Claim 8, Beckman contends, in addition to its contention with respect to Claim 1, that each of the accused Beckman pH meters utilizes:

[A] purchased integrated circuit chip and defendant does not know the detail circuitry of the chip; defendant does not make any effort to control the drain-to-source bias current nor the gain characteristic and does not adjust or control either current or gain and does not know whether or not such current is at a level where the gain characteristic is independent of temperature variation.

Mr. Cardeiro testified, based upon the manufacturing literature (PX 26), that the manufacturer of the integrated circuit chip selects the drain-to-source bias current at the level where the gain characteristic is independent of temperature variation over an ambient temperature range (R 157–60).

Thus, the 940A/941A family of pH meters clearly infringes Claims 1, 2, 3, 8 and 12.

Plaintiff's Post Trial Brief, pp. 36 and 37.

### Damages

Rosemount is entitled to treble damages and reasonable attorney's fees. A hearing

date in connection with damages and attorney's fees will be set after consultation between counsel and the Court.

Counsel for the plaintiff is ordered to prepare a judgment pursuant to Local Rule 7 consistent with this memorandum. (Judgment should be set forth as a separate document as required by Rule 58 of the Federal Rules of Civil Procedure.)