**FOSECO INTERNATIONAL LIMITED, Plaintiff,**

v.

**FIRELINE INC., Gallis, Inc., Randall Gallatin, Defendants.**

**No. C80–595A.**

United States District Court, N.D. Ohio, E.D.

Sept. 19, 1984.

On Motion for New Trial Dec. 6, 1984.

---

See also, D.C., 546 F.Supp. 22.

Hal D. Cooper, Robt. C. Kahrl, Jones, Day, Reavis & Pogue, Cleveland, Ohio, John J. McArdle, Jr., Stephen G. Rudisill, Leydig, Voit, Osann, Mayer & Holt, Ltd. Chicago, Ill., for plaintiff.

Walter J. Blenko, Jr., Pittsburgh, Pa., Wayne D. Porter, Jr., Burge & Porter Co. LPA, Cleveland, Ohio, Chester E. Gordon, Lakewood, Ohio, for defendants.

**1540**

## MEMORANDUM OPINION

DOWD, District Judge.

This patent infringement action came before the Court for a bench trial on July 18–19, 1983. At the close of the trial, the Court deferred decision pending the filing of the transcript and post-trial briefs. Briefing was completed on May 25, 1984. Based upon the evidence presented at trial and the post trial briefs of the parties, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

A. *Patent-in-suit and Parties.*

This action involves United States Patent 4,041,199 issued on August 9, 1977. The '199 patent is entitled "Refractory Heat-Insulating Materials" and describes a heat-insulating riser sleeve used for lining the riser of a mold used for casting steel. Risers, riser sleeves and their use in steel making are discussed in more detail later in this opinion.

John E. Cartwright was the original patentee on the '199 patent. He subsequently assigned the '199 patent to his employer, the plaintiff, Foseco International Limited (FIL), an English Company having a principal place of business in Birmingham, England. FIL is a wholly owned subsidiary of Foseco Minsep Ltd. (Minsep), another English corporation. In the United States, Foseco, Inc., (US Foseco), a Delaware corporation with a principal place of business in Cleveland, Ohio, is licensed to practice the '199 patent. US Foseco is also a wholly owned subsidiary of Minsep. The relationships between this family of companies, fortunately, are not particularly relevant to determination of the issues before the Court. Unless otherwise noted, therefore, the Court will refer to the companies individually and collectively as Foseco.

Fireline, Inc. (Fireline), is an Ohio corporation with its principal place of business in Youngstown, Ohio. Among other activities, Fireline manufactures and sells riser sleeves used in the casting of metals. One of these riser sleeves, marketed under the trade name "Steeline," is accused to infringe upon the '199 patent.

Randal C. Gallatin is an individual residing in Brunswick, Ohio. A former Foseco employee, Mr. Gallatin is the founder and president of Gallis, Inc., (Gallis) an Ohio corporation. Gallatin and Gallis' business activities include the sale of riser sleeves, particularly the Steeline sleeve involved in this case. Further, Foseco alleges that Gallis and Gallatin induced Fireline to initially develop and manufacture the Steeline sleeve.

The defendants have presented a common defense. For ease of reference, the Court will refer to the defendants collectively as Fireline.

B. *Riser Sleeves and Their Use In Casting Metal.*

A general understanding of metal casting operations and the use of riser sleeves in these operations is necessary to understand the '199 patent. To be marketable, finished metal castings must be made of a uniform density. Any cavities within the casting render the finished product unmarketable. The industry, therefore, must produce cavity-free castings. Production of cavity free castings, however, is complicated by the physical fact that molten metal occupies more space than solid metal. As a result, if molten metal fills a mold in its liquid state, the contraction of the metal during the cooling process will leave cavities within the hardened casting. Because castings uniformly cool from the outside, a single "shrinkage cavity" will develop in the center of the casting unless some remedial action is taken. This process is depicted below:

The industry has developed the use of "risers" as a solution to this problem. A riser is a reservoir of molten metal placed above the desired casting. As the metal in the mold cools and contracts, the molten metal from the riser flows down into the mold, thereby preventing the development of a shrinkage cavity. Ultimately, the casting and the riser solidify into a single piece, with the shrinkage cavity in the riser, not the casting. The riser is then cut away from the casting and remelted for later use, leaving a uniformly solid metal casting.

Two factors influence the design of a riser. The riser has to be designed so that the metal in the riser remains molten longer than the metal in the casting mold. In addition, cost efficiencies require as small a riser as possible. As such, the industry seeks to use the smallest possible riser which will take longer to harden than the metal in the mold.

In practice, the industry uses riser sleeves to help achieve these goals. A riser sleeve is a cylindrically shaped device which surrounds and contains the riser. To perform its function of keeping the metal within the riser molten, the riser sleeve must insulate or heat the molten metal in the riser. Riser sleeves are made of re-

fractory material [1] capable of withstanding the high temperature of molten metal, yet are sufficiently inexpensive that they can be disposed of after a single use. The riser sleeve reduces the cost of casting molten metal by allowing the use a smaller riser while maintaining the integrity of the casting.

The drawing below shows the use of a riser sleeve in making a metal casting.

Molten metal is poured into the casting and the riser through the gating system indicated at left. The riser sleeve surrounds the riser and sits on top of the desired casting. The rest of the system, including the mold for the casting, is encased in sand. After the metal hardens, the entire system is opened, the finished casting and riser are removed from the system and the riser sleeve is thrown away.

## C. *The Developing Art of Riser Sleeves.*

In the years preceding the '199 patent, three different types of riser sleeves were in common use—exothermic, non-exothermic and mildly exothermic. An exothermic riser sleeve contains a fuel which either burns or chemically reacts to generate heat and keep the metal in the riser in molten form. A non-exothermic or insulating sleeve produces little or no heat, but keeps the metal in the riser in molten form through an insulating process. A mildly exothermic sleeve combines both of these properties; the sleeve generates heat, but

also acts as a reasonably good insulator after the heat producing fuel is expended.

The riser sleeves involved in this lawsuit are all manufactured through a similar process. The various chemical ingredients are poured into water to form a slurry solution. The riser sleeve is then formed on a mesh mold by using a suction device to draw the slurry through the mesh. The water is drawn through the mesh by the suction pump, leaving the solid materials on mesh in the shape of a finished riser sleeve. The riser sleeve is then removed from the slurry solution, the mesh mold is cut away and the riser sleeve is dried by baking in a special oven.

Riser sleeves are made from a combination of chemical substances. A principal ingredient in riser sleeves is a high temperature fiber such as aluminum silicate, calcium silicate or asbestos. These fibers are easily molded into the various shapes needed for riser sleeves and produce a porous structure providing excellent insulation. Riser sleeves also contain refractory fillers such as aluminum oxide (alumina). These

---

**1.** Refractory materials include a range of non-metallic ceramic substances that are characterized by their suitability for use as structural materials in contact with other substances at high temperatures.

smaller particles add strength to the riser sleeve and allow it to withstand the effects of exposure to molten metal. All riser sleeves also include binders which act as the glue which holds the other ingredients in the desired shape at both low and high temperatures. Low temperature binders include starches and resins; high temperature binders include colloidal silica.

Exothermic riser sleeves add fuel and initiators to these substances. A typical fuel, such as aluminum, undergoes a chemical reaction which produces heat when exposed to the high temperatures of molten metal. Initiators such as fluorides and oxygen are needed to create the chemical environment which allows the fuel to engage in this reaction.

During the 20 years preceding the development of the '199 patent, Foseco has manufactured and marketed exothermic, non-exothermic and mildly exothermic riser sleeves.

Beginning in 1950, Foseco has sold a "Feedex" sleeve, a relatively conventional exothermic riser sleeve. The Feedex sleeve uses aluminum as its fuel. The utility of the Feedex sleeve is limited, however, because it is a poor insulator, brittle, expensive, and produces objectionable fumes. Further, like all exothermic riser sleeves, it does not generate enough heat to allow its use with large diameter risers.

Beginning in 1965, Foseco began marketing its Kalminex sleeve, a mildly exothermic riser sleeve. This sleeve eliminated the problems with brittleness and fumes and adaptability for large diameter risers, but was still relatively high in cost and poorly designed for use with "rangy" castings.[2]

Foseco also markets a Kalmin 15 sleeve, a non-exothermic riser sleeve for use with low-temperature, non-steel casting operations. The Kalmin 15 sleeve is made from a mixture of aluminosilicate fiber, starch, colloidal silica sol, and aluminum sulfate. The Kalmin 15 sleeve was used in casting

iron, brass and aluminum, but proved unacceptable for use with steel.

### D. *Development of the '199 Patent—The Problem Presented.*

As this discussion indicates, the existing riser sleeves were not well suited for use in casting steel. The existing exothermic and mildly exothermic riser sleeves were relatively expensive and had significant limitations. Most notably, there was no suitable riser sleeve available for the rangy castings made by railroad foundries.

Non-exothermic riser sleeves were not available for use in casting steel prior to the '199 patent. Non-exothermic riser sleeves had been used in casting relatively low-melting-point metals such as cast iron, aluminum and brass. Steel, however, is typically poured at much higher temperatures of 2850° F. or higher. The existing non-exothermic riser sleeves would not function under these conditions.

Molten steel presented two problems for the existing non-exothermic riser sleeves. The aluminosilicate fibers used in these sleeves tend to soften and lose their integrity when exposed to the high temperatures of molten steel. In addition, the surface of molten steel contains ferrous oxide, a chemical which tends to react with insulating silicate fibers to form an iron silicate, an unwanted by-product, with a relatively low melting point. This process, called slag attack, renders the riser sleeve ineffective as an insulating material.

### E. *Development of the '199 Patent—The Solution.*

During the mid-1960s, Foseco became aware of the limitations of the Kalminex riser sleeve in casting steel. Beginning in 1967, therefore, Foseco personnel in both the U.S. and England began working toward development of an alternative riser sleeve suited for use in casting steel. For nearly two years before the development of the invention described in the '199 patent, Foseco personnel, including John E. Cart-

---

**2.** A casting is "rangy" if it has a high ratio of surface area to weight. A "chunky" casting, in contrast, has a low ratio of surface area to weight.

wright, the patentee, made repeated efforts to develop the alternative sleeve.

Early on, these attempts focused upon non-exothermic riser sleeves. Foseco's existing Kalmin 15 non-exothermic riser sleeve served as a starting point for the inquiry. That riser sleeve, ordinarily used with lower melting point metals, proved unsuccessful because the Kalmin 15 riser sleeve would not stand up to the higher temperatures of molten steel and was subject to slag attack.

During 1968, Cartwright made the critical discovery which led to the riser sleeve described in the '199 patent. He discovered that the addition of aluminum powder in the riser sleeves allowed them to withstand the temperatures and slag attack associated with molten steel. In Cartright's view, the ferrous oxide, which otherwise attacks aluminosilicate fibers, when exposed to elemental aluminum, is converted into aluminum oxide and elemental iron.[3] Neither of these substances poses a threat to the integrity of the fibers. In fact, the aluminum oxide forms another heat resistant layer on the inner surface of the riser sleeve.

This use of aluminum differs from the role aluminum plays in the Feedex and Kalminex sleeves. In those sleeves, the aluminum serves as a fuel to generate heat. In the '199 patent, the aluminum does not engage in a significant heat producing reaction, instead serving the alternative function of engaging in this protective reaction. The aluminum which does not combine with the ferrous oxide apparently does not engage in a heat producing reaction.

With the exception of this use of aluminum, the Cartwright invention uses substances found in other previous riser sleeves. The invention uses a large percentage of aluminosilicate fiber as an insulating material. The invention further uses alumina as a refractory particulate filler to maintain the integrity of the riser sleeves. Finally, the invention uses a combination of starch and colloidal silica sol as a binder to hold the solid ingredients in place.[4]

The result of this combination of ingredients is the first successful non-exothermic riser sleeve usable for casting molten steel. The Cartwright invention produces a sleeve of low density which is a good insulator. The sleeves are gas-permeable and do not produce any noxious fumes. Most importantly, the sleeve is resistant to the temperatures and slag attack associated with molten steel and is relatively inexpensive to produce.

### F. Comparison With Prior Art.

As the preceding discussion indicates, each of the individual ingredients of the Cartwright invention had been used in riser sleeves prior to Cartwright's invention. The particular combination claimed in Cartwright patent, however, is new. Defendants have introduced into evidence nearly forty patents in other prior art items to show that the Cartwright patent is obvious because of the prior art. The parties, however, have focused upon five items as presenting the most relevant prior art. Those patents are discussed individually below.

### 1. Rumbold '667 Patent.

This patent teaches an improved version of the Kalminex sleeve sold by Foseco. The patent describes a riser sleeve used in casting steel which includes aluminosilicate fibers, alumina, aluminum and a binder. This sleeve falls into the broad class of mildly exothermic riser sleeves. The patent differs from the Cartwright invention because it does not teach the use of a non-exothermic riser sleeve and does not use a binder formed by combining starch and colloidal silica sol. Most importantly,

---

**3.** In chemical terms, the reaction is described as
$$2Al + 3FeO \longrightarrow Al_2O_3 + 3Fe.$$
Chemists refer to this reaction as the reduction of ferrous oxide using aluminum.

**4.** A very small amount of aluminum sulfate is used to help mix the ingredients when they are in slurry form during production, although the use of this substance is not a significant part of the invention.

this riser sleeve uses aluminum to produce an exothermic reaction, not to engage in the non-exothermic reaction used by the Cartwright invention to protect the aluminosilicate fibers.

### 2. Carborundum Patent.

The Carborundum patent, United Kingdom Patent No. 844,056 discloses a refractory material using fine aluminosilicate fibers, and all the other substances in the '199 patent except the starch and the binder. A review of the patent indicates, however, that the focus of the patent is the range of uses available for the particular type of aluminosilicate fibers being manufactured by Carborundum and that the patent may be broadly read to suggest a riser sleeve. Significantly, the aluminum in the Carborundum patent serves to conduct heat away from the molten metal in a mold, a function very different from the insulating function of aluminum in the '199 patent.

### 3. duPont '927 Patent.

This patent discloses a heat-resistant material in which fibers are bound together by a binder of starch and colloidal silica sol. The focus of this patent is its use of the starch and colloidal silica sol binder, the binder used in the '199 patent. The duPont patent does not describe a riser sleeve, nor does it suggest the use of aluminum with the patented invention for any purpose. Instead, it teaches the use of starch in the binder to attract the colloidal silica to the fibers and to provide additional strength to the product.

### 4. Kalmin 15 Sleeve.

Prior to the development of the Cartwright invention, Foseco also sold the non-exothermic riser sleeve. This riser sleeve was used solely with low melting temperature metals like cast iron, brass and aluminum. The sleeve proved unsuccessful for use with steel. The Kalmin 15 sleeve contained the same aluminosilicate fiber, starch and colloidal silica sol ultimately used in the '199 patent. It did not contain aluminum and was not suitable for use with steel.

### 5. Babcock & Wilcox Sprue Liner.

During the mid-1960s, Babcock & Wilcox (B & W) developed and marketed a sprue liner for use in casting operations. While the testimony on this subject was not developed very extensively at trial, it appears that a sprue serves as a part of the gating system in a casting operation and that a sprue liner is a refractory material placed in the sprue to facilitate the passage of the molten material through the sprue. Thus, the sprue liner is a substantially different product from a riser sleeve. The B & W sprue liner was made with aluminosilicate fiber and the starch and silica sol binder disclosed by the duPont '927 patent, but did not contain any aluminum.[5] Foseco purchased a number of these sprue liners and had knowledge of their composition.

### 6. Summary.

With the exception of the Cartwright invention's use of aluminum, the prior art taught the other elements of the invention. The aluminosilicate fibers had been used in the '667 patent, the Carborundum patent, the Kalmin 15 sleeve, and the Babcock & Wilcox sprue liner. The colloidal silica sol and starch binder had been used in the Kalmin 15 sleeves, duPont '927 patent, and the Babcock & Wilcox sprue liner. Finally, aluminum had been used, albeit for a different purpose, in the Carborundum and Rumbold '667 patents. The Cartwright invention's unique use of aluminum to prevent slag attack and to make a non-exothermic riser sleeve feasible for use with steel, however, was unique.

---

**5.** Foseco has challenged Fireline's reliance on the Babcock & Wilcox sprue liner as prior art because of Fireline's failure to make reference to the sprue liner in its prior art statement filed pursuant to 35 U.S.C. § 282. In view of this Court's analysis of the prior art issues, the Court need not decide whether Fireline was required to include the sprue liner in this pleading.

### G. *Marketing History of the '199 Patent.*

The Kalmin 70 sleeve produced under the '199 patent was first marketed commercially in England in 1970. Marketing in the United States began on a limited basis in the United States in 1971. Once in the market, the Kalmin 70 sleeve proved to be an attractive product. The sleeve cost approximately half as much as the Kalminex sleeves and opened new markets for riser sleeves. Previously, railroad foundries had not used riser sleeves for their casting operations because they used relatively small risers and found the existing riser sleeves too expensive. With the development of the Kalmin 70 sleeve, those foundries began using riser sleeves.

These marketing advantages translated into a large volume of sales for the Kalmin 70 sleeves. During the past ten years, Foseco has sold nearly $16 million worth of the Kalmin 70 sleeves in the United States. Foseco has also had nearly $6 million of sales for the Kalmin 70 sleeves in the United Kingdom during the twelve years the sleeve has been marketed there. Sales of the Kalminex sleeves have not fallen during that period, suggesting that a large portion of the Kalmin 70 sleeves are being sold to customers who were not previously using riser sleeves.

### H. *The Gallatin Connection.*

The defendant, Randal Gallatin, is a former Foseco employee. He joined Foseco in 1965. During the ensuing eleven years, Gallatin advanced through a number of positions with Foseco. While working at Foseco, Gallatin sold the Kalmin 70 riser sleeves and was familiar with the secret formulas for the composition of the Kalmin 70 riser sleeve. In November 1976, Gallatin was terminated from his position as a project manager of special coatings for Foseco because he had formed Gallis, a company set up to compete with Foseco.

In early 1978, Fireline moved into a larger manufacturing facility and made an unsuccessful attempt to develop its own riser sleeve for use in casting steel. Up until that time, Fireline had only sold riser sleeves used for casting metals with lower melting points than steel. Fireline remained interested, however, in developing a riser sleeve for use with steel.

In June 1978, Gallatin contacted Roger Jones, Fireline's president, to discuss a formula for making a riser sleeve for use in casting steel. After serious negotiations, Fireline, Gallis, and Gallatin entered into an agreement regarding the manufacture and sale of the proposed riser sleeve. As part of the agreement, Fireline agreed to pay a royalty to Gallatin on the new product and awarded Gallatin a large exclusive sales territory.

### I. *The Fireline Riser Sleeve.*

During the period following the agreement between Fireline, Gallis and Gallatin, Fireline has produced three different versions of its "Steeline" riser sleeves which are alleged to infringe upon the '199 patent. The Court will discuss each of these formulas separately.

#### 1. *First Recipe.*

During the period from late 1978 through early fall, 1979, Fireline produced a Steeline riser sleeve using its first recipe. Riser sleeves produced using this recipe consisted of:

| INGREDIENT | DRY WEIGHT PERCENTAGE |
|---|---|
| Aluminosilicate Fiber | 66.4% |
| Aluminum Powder | 8.9 |
| Alumina | 17.1 |
| Aluminum Sulphate | .5 |
| Ludox [6] | 5.0 |
| Starch | 2.1 |
| | 100 % |

Fireline did not commercialize the riser sleeves made using this recipe because the sleeves could not be made profitably due to the extended time needed to form the riser sleeves made with this recipe.

#### 2. *Second Recipe.*

Fireline produced its first commercially acceptable Steeline riser sleeve in October,

---

**6.** Ludox is a trade name used by duPont to identify its colloidal silica sol.

1979.[7] This recipe followed the first recipe with the addition of phenol formaldehyde (P.F.) resin to the other ingredients. Resins have been used to waterproof foundry products in the United States for many years.[8] In fact, the Kalmin 70 sleeves marketed by Foseco in the United States use P.F. resin as a waterproofing agent, although the Kalmin 70 sleeves marketed in England do not use resin. The P.F. resin performs some incidental binding functions, primarily assisting in low temperature binding of the riser sleeve. The resin, however, does not change the ability of the riser sleeve to withstand high temperature steel casting operations.

### 3. Third Recipe.

In June 1980, Fireline once again changed its recipe for the Steeline riser sleeve. At that time, Fireline substituted Wesol FB polysilicate solution for the Ludox colloidol silica sol used in the first and second recipes. No other changes were made in this third recipe for the Steeline riser sleeve.

A polysilicate solution is somewhat different from a colloidal silica sol. Polysilicate solutions have a particle size of approximately .3 nanometers

$$(\frac{.3m}{10^9}),$$

while colloidal silica sols have a particle size of approximately 10 or 15 nanometers

$$(\frac{10-15m}{10^9}).$$

A colloidal silica sol is an opalescent liquid while a polysilicate solution is clear. Also, a polysilicate solution is less likely to break down when exposed to cold temperatures than a colloidal silica sol.

Despite these chemical differences, Wesol FB polysilicate solution serves as a substitute for Ludox colloidal silica sol in producing the Steeline riser sleeve. The Wesol FB combines with the starch to form a high and low temperature binding agent in the same manner as Ludox. Wesol FB does not perform any subsidiary functions in the riser sleeve that are not performed by Ludox. In actual use, there are no differences between the performance of riser sleeves made with Wesol FB and riser sleeves made with Ludox colloidal silica sol.

### J. Prosecution History of the '199 Patent.

The '199 patent was the subject of a rather complicated prosecution history in the Patent and Trademark Office (PTO). The '199 patent was granted nearly eight years after Foseco filed its first application for the patent. In the intervening years, a total of four applications were filed and a series of other documents passed between Foseco and the PTO. Understanding of that prosecution history is vital to any consideration of at least some of Fireline's challenges to the validity of the patent. This section outlines the patent prosecution history; the following section deals with the developing history of the prior art disclosures.

The patent prosecution history of the Cartwright invention began with the filing of an application for a British patent on September 25, 1968. That application led to the granting of U.K. Patent No. 1,283,-692 on August 2, 1972. The British patent is not the direct subject of this lawsuit.

In the United States, the patent prosecution history of the Cartwright invention began with the filing of U.S. application no. 860,398 on September 23, 1969. That application set forth a total of twelve claims. After an amendment was filed on March

---

**7.** Fireline changed its recipe for the Steeline sleeve in February 1980. This change involved only an insignificant modification of the proportions of the various substances used in making the sleeve. The Court, therefore, will not separately analyze this recipe to determine if it infringes upon the '199 patent.

**8.** During storage, riser sleeves are subject to exposure to moisture. If moisture gets into the riser sleeve, the riser sleeve becomes unusable. When a moist riser sleeve is used for casting molten metal, the high temperatures of the metal will transform the moisture into superheated steam almost instantaneously with explosive effect.

19, 1971, the patent examiner rejected all of the claims over the prior art, specifically the Rumbold '667 patent. Foseco subsequently abandoned this application.

The next step in the prosecution history of the '199 patent was Foseco's filing of application no. 189,642 on October 14, 1971 as a C–I–P of application no. 860,398. This application contained eleven claims. After a number of amendments, the PTO issued a notice of allowance on some of the claims and rejected the remainder on October 3, 1973 because of the Rumbold prior art. No patent was issued because Foseco did not pay the patent issuance fee and subsequently abandoned this application on March 11, 1974.

Foseco then filed application no. 429,799 on January 2, 1974, as a C–I–P of these abandoned applications. This application contained a total of eleven claims. The PTO initially rejected this application because the claims regarding the binder were not drawn with sufficient specificity and because of the Rumbold '667 prior art. After amendment, the PTO rejected the amended application on December 17, 1974 citing the Carborundum patent as prior art. The application was revived on June 2, 1975, for purposes of considering Foseco's attempt to distinguish the Carborundum and rejected again by the PTO on June 12, 1975. Ultimately, this application was also abandoned.

Finally, Foseco filed application no. 637,-522 on December 4, 1975, as a C–I–P of application no. 429,799. This application contained a total of eight claims. On April 27, 1976, the PTO rejected this application over the prior art, particularly the Rumbold '667 patent. On July 27, 1976, Foseco filed an amendment to the rejected application attempting to distinguish the prior art. The PTO also rejected this amended application on October 7, 1976, again relying on prior art. Finally, on January 7, 1977, Foseco filed a final amendment to its application disclosing a total of six claims. The PTO granted this application on February 10, 1977, and the '199 patent was issued on August 9, 1977.

K. *Prosecution History Disclosures.*

A number of questions arose during trial regarding the disclosures and representations made by Foseco during the prosecution history of the '199 patent. The representations are all contained in the application files reflected by defendants' exhibits AJ, AK, AL, and AM. The Court finds that these exhibits are true and accurate copies of the application files and that the Court need not, therefore, make detailed findings regarding the contents of these application files.

The Court will make detailed findings regarding the failure of any of these application files to contain disclosures of the Kalmin 15 riser sleeve, B & W sprue liner, or duPont '927 patent. All of these items of prior art contain a starch and colloidal silica sol binder and were known to Foseco prior to the beginning of the application process. Specifically, the duPont '927 patent was discussed in an October 23, 1968 patent survey done by Foseco. That survey was distributed to many of the individuals involved in the prosecution of the '199 patent, although there is no evidence that any of these individuals made a connection between the survey and the prior art disclosures made during the prosecution of the '199 patent.

Foseco rediscovered the significance of the duPont '927 patent during early 1977. On July 26, 1977, Foseco petitioned the PTO to consider the duPont '927 patent as prior art. The PTO rejected Foseco's petition because it had issued the '199 patent on August 9, 1977 before any consideration was given to the disclosures regarding the duPont '927 patent.

## CONCLUSIONS OF LAW

In order to prevail in this case, Foseco must prove that the '199 patent is valid and that Fireline has infringed upon the patent. Fireline has challenged the validity of the patent as well as the question of whether the Steeline sleeve infringes upon the '199 patent. The Court will address these topics separately.

## I. *Validity.*

Fireline has raised four challenges to the validity of the '199 patent. Fireline argues that the '199 patent is invalid because of a prior use of the Kalmin '70 sleeve more than one year prior to the filing of the December 4, 1975 C–I–P application for the '199 patent. Second, Fireline argues that the '199 patent is invalid because of obviousness under 35 U.S.C. § 103. Third, Fireline argues that the '199 patent is invalid because of failure to disclose the best mode for practicing the patent under 35 U.S.C. § 112. Finally, Fireline argues that the patent is invalid because of fraud perpetrated on the PTO by Foseco during the prosecution of the '199 patent application.

■■■ Before considering the individual challenges to the validity of the patent, the Court notes the presumption of validity accorded to all patents issued by the PTO. Under 35 U.S.C. § 282:

A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on the party asserting it.

Interpreting the statutory presumption, a court must "begin by presuming that the invention has those [essential characteristics of utility, novelty and non-obviousness.]" *Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1567 (Fed.Cir. 1983). The patent holder has no other statutory burden of proof. The party challenging validity, however, must carry its burden of overcoming the presumption by citing relevant prior art which was not considered by the PTO in granting the patent. *Id.* Regardless,

the presumption of validity is not weakened or destroyed where merely pertinent non-considered prior art is introduced, but ... the offering party is more likely to carry the burden of persuasion ... when art *more* pertinent than that considered is introduced.

*Id.* at 1566 (citations omitted). This presumption of validity carries through the

Court's entire analysis of the validity issues.

### A. *Prior Use.*

Under 35 U.S.C. § 102, a patent may not be issued for an invention which was

patented ... in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States....

*Id.* at § 102(b). Under this rule, Foseco's patent is invalid if it was patented overseas or put on sale in this country more than one year prior to the date of the application filing. As the Kalmin '70 sleeve produced using the '199 patent was patented in England as early as August 1972 and sold in the United States beginning in 1971. The '199 patent is invalid because of prior use if it carries the effective date of the December 4, 1975, C–I–P application which ultimately led to the grant of the '199 patent. If the '199 patent carries the effective date of the original September 23, 1969 application (parent application), however, the patent will stand over a claim of prior use.

The effective date of a patent for § 102 purposes is fixed by 35 U.S.C. § 120. Under that statute, an inventor receives the benefit of the parent application's filing date if the second application discloses the same invention as the parent application.[9] Under the statute, therefore, the critical issue becomes whether the parent application discloses the *same invention* as is claimed by the second application. *See In re Salmon,* 705 F.2d 1579, 1581 (Fed.Cir. 1983).

■■ Where a second application does not disclose the same invention as the parent application, the patent carries two effective dates. Any new subject matter disclosed in the second application carries the effective date of the second application's filing. The filing date of the parent application is the effective date for claims made in the second application which are also disclosed in the parent application, as well as for

---

**9.** Section 120 refers to the definition of invention set out in 35 U.S.C. § 112.

claims added through amendment which are deemed "inherent" to the parent application. *See Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1438 (Fed.Cir. 1984). Foseco, therefore, must demonstrate that the subject matter of the '199 patent was either disclosed or inherent in the parent application.

In this case, this issue is presented in the context of the addition of the starch and colloidal silica sol binder to the claims. Foseco argues that it should receive the benefit of the earlier effective date for the binder disclosures, and the patent as a whole, because this binder was disclosed or at least inherent in the earlier applications. The decision in *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423 (Fed.Cir. 1984) precludes consideration of this argument. Relying on the PTO Manual of Patent Examining Procedure (MPEP) definition of a C–I–P application, the *Litton* Court held that the filing of a C–I–P application raises an irrebuttable presumption that the C–I–P application adds new subject matter.[10] An applicant's filing of a C–I–P application, therefore, estops the applicant from arguing that the C–I–P application does not disclose new subject matter or that the subject matter was inherent in an earlier application. 728 F.2d at 1438–39.[11] The Court ruled that:

**10.** The MPEP defines a C–I–P application as *"adding matter not disclosed* in the said earlier [application.]" MPEP § 201.08.

**11.** The Court took the view that, if Litton believed that the new subject matter disclosed in the C–I–P application was inherent in the original application, Litton should have filed a Rule 60 application for a continuation and, if necessary, pursued its appeals through the PTO. Having selected the course of filing a C–I–P application, the Court would not allow Litton to argue the contrary view.

**12.** The Court notes that this result flies in the face of the Federal Circuit's mandate that

patent cases should not be mere games played with pieces of paper called references and the patent in suit.

*Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1544 (Fed.Cir.1984). Mindful of this mandate, having heard the highly informative expert testimony presented at trial, having

A conclusion, however, whether or fact or law, that [the applicant] did not really add new matter to its C–I–P disclosure cannot retroactively contradict the prosecution history of the ... patent in which [the applicant], by recasting its Rule 60 continuation application as a C–I–P, implied that it did add new matter.... We do not need, thus, to address the district court's findings as to inherency.

*Id.* at 1438–39. Under this authority, this Court is foreclosed from making its own *de novo* factual determination regarding the inherency of the binder disclosures.

Under *Litton*, therefore, Foseco is estopped from arguing that the disclosures of a starch and colloidal silica sol binder were inherent or disclosed in the previous applications. The disclosures of a starch and colloidal silica sol binder, therefore, carry an effective date of December 4, 1975. As each of the claims in the '199 patent contain the starch and colloidal silica sol binder, and the prosecution history of the '199 patent indicates that the Cartwright invention was deemed unpatentable by the PTO without the disclosure of this binder, these claims all carry an effective date of December 4, 1975. As the Cartwright invention was patented in England in 1972 and sold in the United States in 1971, there is a prior use under 35 U.S.C. § 102(b), thereby invalidating the '199 patent.[12]

become intimately familiar with the field of riser sleeves while drafting this opinion, the Court has reached its own conclusions regarding the relevant portions of the prosecution history of the '199 patent. The Court has concluded that the Cartwright invention's use of aluminum to produce a non-exothermic riser sleeve is truly novel, innovative and useful. As such, the Cartwright invention represents a significant breakthrough in the industry and the PTO's initial refusal to grant a patent for this subject matter is unexplainable. The addition of starch and colloidal silica sol to the claims in the later stages of the prosecution history did nothing to make the Cartwright invention any more worthy of a patent. As such, the PTO's grant of the '199 patent after the colloidal silica sol and starch binder was added to the claims is also unexplainable.

In spite of these observations, the Court believes that the *Litton* decision requires invalidation of the patent because of these unexplaina-

## B. *Obviousness.*

■ Consideration of obviousness begins with a review of the statutory requirement of non-obviousness. In relevant part, that statute provides that

A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art is such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. Interpreting this section, the Supreme Court has ruled that the obviousness inquiry involves consideration of

the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.... Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). The Court must now consider the issue of non-obviousness under this standard.

### 1. *Scope and Content of the Prior Art.*

The scope of the prior art is discussed in detail on pages 12–15 of the opinion and need not be repeated in detail. In sum, the relevant prior art focuses upon five items. The Rumbold '667 patent describes a mildly exothermic riser sleeve usable in casting steel. The Carborundum patent describes a refractory material containing roughly the same chemical substances as the '199 patent, but using a different type of aluminosilicate fibers and not including starch in the binder. The duPont '927 patent teaches a starch and colloidal silica sol binder

like the one used in the '199 patent. Foseco's Kalmin 15 non-exothermic riser sleeve was in widespread use in casting low-melting-point metals. The B & W sprue liner showed a production use of aluminosilicate fibers with a starch and colloidal silica sol binder, although not in a riser sleeve.

### 2. *Differences Between the Prior Art and the Claims.*

The parties are in substantial agreement regarding the comparison of the prior art to the '199 patent. As noted in the Court's findings on prior art, each element of the '199 patent formula had been used prior to the Cartwright invention. No one, however, had put all these elements together to create a product like the Kalmin '70 riser sleeve. Cartwright's use of aluminum in a reduction reaction, as opposed to an exothermic reaction, was innovative and allowed Foseco to develop the first working non-exothermic riser sleeve that was usable with molten steel.

### 3. *Level of Ordinary Skill in the Art.*

The third element of the obviousness inquiry under *Graham* is "the level of ordinary skill in the pertinent art...." 383 U.S. at 17, 86 S.Ct. at 694. In this case, the parties dispute the proper field of "pertinent art" and whether Fireline has met its burden of demonstrating the level of skill in that field.

The parties have extensively argued the question of the proper field of pertinent prior art. Foseco argues that the proper field is riser sleeves for foundry products while Fireline argues that the proper field is refractory materials in general. The testimony at trial indicated that foundries use refractory materials for purposes other than riser sleeves. The evidence also indicated that the production of refractory materials is a relatively specialized field. In view of this analysis, the Court concludes

---

ble actions of the PTO. The Court, therefore, has concluded that the '199 patent is invalid because of a prior use. In the event that a reviewing court concludes that *Litton* does not require this result, the Court believes that there

should be no invalidation for prior use because the critical portions of the invention described in the '199 patent were disclosed early enough in the application process to make a prior use defense inappropriate.

that the proper field of prior art is the production of refractory materials for use in metal foundries.

Having identified the relevant field, the Court next turns to Foseco's argument that Fireline has failed to produce sufficient evidence on the level of ordinary skill in the art and, therefore, Fireline may not demonstrate obviousness. *See Universal Athletic Sales Co. v. American Gym,* 546 F.2d 530, 543 (3rd Cir.1976). During the trial of this case, however, the Court heard testimony from Ronald W. Ruddle, a technical director for Foseco; John F. Wallace, an expert retained by Foseco, and James Kent Sprinkle, an expert in the design and manufacture of riser sleeves. These gentlemen were all involved in the art of production of refractory materials for metal foundries. The Court has observed that these individuals are familiar with the properties of the various chemical substances involved in making refractory materials and are quite capable of discussing the particular problems faced in developing refractory materials for use by metal foundries. Their rather highly developed skills suffice to set the standard of ordinary skill in the relevant art and require rejection of Foseco's contention that Fireline has not demonstrated the level of skill in the art.

### 4. *Secondary Indicators.*

Regardless of the Court's analysis of these primary considerations in the obviousness inquiry, the Court must also analyze the secondary considerations in the obviousness inquiry. *See Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1538–39 (Fed.Cir.1983). The Supreme Court has recognized "commercial success, long felt but unsolved needs, [and] failure of others" as appropriate secondary considerations. *See Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). Foseco urges these secondary considerations, as well as imitation of the invention by others and unexpected results obtained through the invention as evidence of non-obviousness.

The first secondary consideration cited by Foseco is the observation that the major role of aluminum as the critical ingredient in developing a non-exothermic riser sleeve for use with steel was unexpected. The Federal Circuit has recognized unexpected results as a secondary consideration in the obviousness inquiry. *See Lindemann Maschinenfabrik v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1461– 62 (Fed.Cir.1984). This evidence is even more relevant where the prior art does not suggest the avenue pursued by the patented invention. *Id.* at 1462. The Court must therefore determine whether the '199 patent produced unexpected or surprising results as defined by the *Lindemann* decision.

The value of aluminum in producing a non-exothermic riser sleeve for use with steel was unexpected. Previously, aluminum had been used to produce heat in exothermic riser sleeves. No one had discovered the usefulness of aluminum in reducing slag attack. While Fireline is correct in noting that the aluminum in the prior exothermic riser sleeves had probably engaged in the same reduction reaction which prevents slag attack in the Kalmin 70 sleeve, that attribute of aluminum was previously irrelevant because slag attack was not an issue with exothermic riser sleeves that did not use aluminosilicate fibers as an insulating material. Under this analysis, the role of aluminum in the Kalmin 70 sleeve to prevent slag attack on the aluminosilicate fibers was unexpected and surprising.

The next secondary consideration advanced by Foseco is the role of the '199 patent in solving a long standing problem in the industry. Foseco has demonstrated that both Foseco and Fireline engaged in substantial and unsuccessful efforts to develop a non-exothermic riser sleeve for use with steel prior to the development of the Cartwright invention. Apparently, both companies recognized that the development of such a riser sleeve would open new markets, particularly in the railroad foundry industry. While Fireline is correct in noting that the evidence on both of these

points is somewhat limited, in the absence of conflicting testimony, the Court will infer that the industry as a whole had unsuccessfully sought to develop a product like the Cartwright invention.

The third secondary consideration advanced by Foseco is the alleged imitation of the Cartwright invention by Fireline. The Federal Circuit recognizes the significance of imitation as a secondary consideration in the obviousness inquiry. *See Rosemount Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1544, 1546 (Fed.Cir.1984). The Steeline sleeve closely parallels the '199 patent. The role of Gallatin in providing the formula for the Kalmin '70 sleeve to Fireline, and Fireline's willingness to reward Gallatin with a substantial royalty agreement and grant of exclusive sales territory, indicates that Fireline had not found the Cartwright invention, or any other substitute for the Cartwright invention, obvious or otherwise easily reproduced. Fireline's claim that its inability to produce a commercially viable recipe for the Steeline sleeve for two years after receiving the '199 patent does not change this conclusion. Under these circumstances, the Court considers Fireline's Steeline riser sleeve to be an imitation of the Kalmin 70 sleeve which supports the conclusion that the '199 patent was not obvious.

The final secondary consideration of non-obviousness advanced by Foseco is the commercial success of the Kalmin 70 sleeves produced under the '199 patent. In *Lindemann,* the Federal Circuit noted that commercial success is evidence that the invention was not obvious to those who had purchased the claimed invention. 730 F.2d at 1461. In this case, Foseco claims that the commercial success of the Kalmin 70 riser sleeve is evidence that the Cartwright invention was not obvious to Foseco's competitors, who failed to exploit this market. Notwithstanding Fireline's arguments that evaluations of commercial success are unpersuasive because they must be done "after the fact," the Court finds the commercial success of the Kalmin 70 riser sleeve to be significant evidence that the invention

embodied by the '199 patent was not obvious to Foseco's competitors in the industry.

### 5. *Conclusion on Non-Obviousness.*

With regard to the primary indicia, the issue presented is one of legal characterization. Fireline argues that the discovery of new advantages from old structures does not render those old structures patentable. Foseco, in contrast, argues that a structure is non-obvious where selective reading of a range of prior art is required to render the invention obvious. In Foseco's view, Fireline's reliance on nearly 40 different patents raises a presumption that the prior art had not made the '199 patent obvious.

■ Fireline's chief contention regarding the obviousness of the '199 patent is the alleged presence of each element of the '199 patent in the prior art. The United States Court of Customs and Patent Appeals, the predecessor to the Federal Circuit, indicated that a patent claiming a new attribute to an old device was not patentable. The Court stated:

> It is true that mere recitation of a newly discovered function or property, inherently possessed by things in the prior art, does not distinguish a claim drawn to those things from the prior art.

*In Re Oelrich,* 666 F.2d 578, 581 (C.C.P.A. 1981). Under this authority, Foseco's claim is valid only if it recites something that was not "inherently possessed" by the prior art. *See also Environmental Designs v. Union Oil Co. of California,* 713 F.2d 693, 698 (Fed.Cir.1983); *Orthopedic Equipment Co., Inc. v. United States,* 702 F.2d 1005, 1012 (Fed.Cir.1983).

■ Something more than the mere presence of each chemical element of the '199 patent in the prior art is required. That additional step in the analysis is discussed in *ACS Hospital Systems, Inc. v. Montefiore Hospital,* 732 F.2d 1572 (Fed.Cir.1984). In that case, the Court stated that:

> Obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, *absent some teaching or suggestion supporting*

*the combination.* Under § 103, teachings of references can be combined *only* if there is some suggestion or incentive to do so.

732 F.2d 1572, 1577 (Fed.Cir.1984) (footnotes omitted). (emphasis added). In making this determination of whether the combination is suggested by the prior art,

> It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit. Monday morning quarterbacking is quite improper when resolving the question of nonobviousness in a court of law.

*Orthopedic Equipment Co., Inc. v. United States,* 702 F.2d 1005, 1012 (Fed.Cir.1983). Under these authorities, a court must analyze the prior art to determine whether it suggests the approach embodied by the Cartwright invention.

The Court now turns to consideration of whether the prior art suggests the combination of chemical substances present in the '199 patent. In making this determination in the context of a patent on a chemical composition, the Court is mindful that it must evaluate not only the ingredients of the composition but also its properties and the manner of making the composition. *See Air Products and Chemicals, Inc. v. Charles S. Turner Co.,* 219 U.S.P.Q. 223, 231 (D.S.C.1983). While aluminum had been used in prior riser sleeves, the prior art did not suggest the use of aluminum in producing a non-exothermic riser sleeve for use with steel. In fact, the prior art, particularly the Feedex sleeve, the Rumbold '667 and Carborundum patents taught away from this use of aluminum. In all of those cases, aluminum was added to the riser sleeve to increase its exothermic, not its insulating, properties. Under this analysis, the Court concludes that the prior art did not suggest the approach embodied by the Cartwright invention.

The secondary indicia of non-obviousness are also important considerations in this case. As the CAFC stated recently in *Ro-* *semount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540 (Fed.Cir.1984):

> Law suits arise out of the affairs of people, real people facing real problems. So here, the technical problem out of which grew the present litigation was real. It was solved by inventor Cardeiro.

*Id.* at 1544. In that case, the Court found that the introduction of the patented device created great competitive problems for the defendant and that the defendant responded by copying the patented device after it was unsuccessful in producing its own device. The Court then went on to find the patented device non-obvious because the "real world facts [were] worthy of great weight in this case." *Id.* at 1546. Under this analysis, the secondary indicia of non-obviousness are of great importance in this case.

The facts of this case closely parallel the situation presented in *Rosemount.* The introduction of the Kalmin 70 sleeve created a competitive problem for Fireline. Fireline engaged in its own efforts to develop a comparable product and when it failed, Fireline simply appropriated the Cartwright invention for its own use. Those observations, in combination with the commercial success of the Kalmin 70 sleeve, further support a finding of non-obviousness.

Based on this analysis, the Court concludes that both the primary and secondary considerations support a finding of non-obviousness. Accordingly, the Court will not invalidate the '199 patent because of obviousness.

## C. *Best Mode.*

▆ Fireline's next challenge to the validity of the '199 patent is based upon Foseco's alleged failure to disclose the best mode for carrying out the invention. The relevant statute provides that:

> The specification shall contain a written description of the invention ... and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. Where the specification fails to set forth the best mode, the patent may be invalidated. *See Union Carbide Corp. v. Borg-Warner Corp.*, 550 F.2d 355 (6th Cir.1977). In this case, Fireline seeks invalidation of the '199 patent for failure to disclose the best mode because of Foseco's failure to disclose the use of P.F. resin in the patent.

Fireline's argument begins with the indisputable proposition that the '199 patent does not disclose the use of P.F. resin. Fireline then goes on to argue that P.F. resin performs an important function in the Kalmin 70 riser sleeve,[13] and that Foseco, the real party in interest, knew of the advantages of using P.F. resin in producing the Kalmin 70 sleeve. From these premises, Fireline then argues that Foseco's failure to disclose the use of P.F. resin in the '199 patent constitutes a failure to disclose the best mode.

Without conceding any factual matters, Foseco challenges the conclusion Fireline attempts to draw from these facts. In Foseco's view, a failure to disclose must reach the level of concealment before it will act to invalidate a patent for failure to disclose best mode. Foseco also makes the related argument that its failure to disclose the use of PF resin is inconsequential because PF resin was a commonly used additive in the relevant industry whose use was distinct from the Cartwright invention.

▮▮▮▮ The Court begins by analyzing Foseco's argument that concealment, and not mere non-disclosure, is required to invalidate a patent for failure to disclose best

mode. The Court of Customs and Patent Appeals has ruled that:

> There is no objective standard by which to judge the adequacy of a best mode disclosure. Instead, only evidence of concealment (accidental or intentional) is to be considered. That evidence, in order to result in affirmance of a best mode rejection, must tend to show that the *quality* of an applicant's best mode disclosure is so poor as to effectively result in concealment.

*Matter of Application of Sherwood*, 613 F.2d 809, 816 (CCPA 1980) (footnotes omitted).[14] In evaluating the quality of the applicant's best mode disclosure, the Court should read into the specification any information which is "known to those having ordinary skill in the art." *In re Howarth*, 654 F.2d 103, 106 (C.C.P.A.1981). Thus, a failure to disclose all of the information in the possession of the inventor is not fatal where the application of routine skill in the art would allow practice of the invention. *Id.* at 816–17.

In this case, the '199 patent can be practiced without any knowledge of the use of resin. While the use of P.F. resin adds useful qualities to the Kalmin 70 riser sleeve, the '199 patent can be practiced commercially, as is done in England, without the addition of P.F. resin. Even if the use of P.F. resin is necessary to meet the best mode disclosure requirement, P.F. resin has been used within the industry for waterproofing purposes for many years. As such, the failure to disclose the use of P.F. resin is the type of omission which can be rectified by the application of routine skill and does not constitute concealment.

---

**13.** Fireline argues that the P.F. resin serves as both a waterproofing agent and a low temperature binder. The Court has found that the low temperature binding function is an incidental benefit derived from the use of the P.F. resin for waterproofing and is not a significant portion of the invention. The undisputed testimony at trial indicates that the '199 patent is used to produce Kalmin 70 sleeves in England without using resin as a low temperature binder. In view of these findings, the Court will not consider the advantages of using P.F. resin as a low temperature binder in determining whether the failure of the '199 patent to disclose the use of resin is

deficient because of a failure to disclose best mode of practicing the invention.

**14.** The Sixth Circuit's decisions in *Union Carbide Corp. v. Borg-Warner Corp.*, 550 F.2d 355, 362–64 (6th Cir.1977); and *Reynolds Metals Co. v. Acorn Building Components, Inc.*, 548 F.2d 155, 163 (6th Cir.1977), cited by Fireline, state a similar rule. To the extent, however, that these decisions differ from the *Sherwood* decision, they are not controlling authority. *See South Corp. v. United States*, 690 F.2d 1368, 1370–71 (Fed.Cir.1982).

Under this analysis, the Court concludes that the '199 patent's failure to disclose the use of P.F. resin in practice of the Cartwright invention does not render the patent invalid under 35 U.S.C. § 112 for failure to disclose the best mode for practicing the invention.

### D. *Fraud on Patent Office.*

The final challenge raised to the validity of the '199 patent is a claim that the patent is invalid because it was obtained through fraud committed upon the PTO by Foseco. Fireline points to a number of deficiencies in Foseco's disclosures of prior art to the PTO and also to a number of alleged misrepresentations made by Foseco to the PTO. In Fireline's view, these nondisclosures and misrepresentations warrant an invalidation of the '199 patent.

Applicants appearing before the PTO are held to the highest standards of candor and good faith. See *Kingsland v. Dorsey,* 338 U.S. 318, 70 S.Ct. 123, 94 L.Ed. 123 (1949). Where that duty is breached, and a patent is granted, the patent is subject to later invalidation. The Federal Circuit has stated that:

> Establishing that a patent was procured by fraud or with such egregious conduct as to render it unenforceable requires clear, unequivocal, and convincing evidence of an intentional misrepresentation or withholding of a material fact from the PTO.... Although inequitable conduct requires less stringent proofs as to both materiality and intent than common law fraud, mere evidence of simple negligence, oversight, or an erroneous judgment made in good faith not to disclose prior art is not sufficient to render a patent unenforceable.

*Orthopedic Equipment Co. v. All Orthopedic Appliances,* 707 F.2d 1376, 1383 (Fed.Cir.1983) (citations omitted). Under this standard, a failure to disclose or misrepresentation to the PTO does not amount to fraud on the PTO unless there has been an intentional misrepresentation or failure to disclose a material fact.

The courts have recognized the difficulties presented by a requirement of direct proof of intentional misconduct. The Federal Circuit has repeatedly stated that:

> The intent element of fraud, however, may be proven by a showing of acts, the natural consequences of which are presumably intended by the actor. Statements made with gross negligence as to their truth may establish such intent.

*Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir.1983). *See also Driscoll v. Cebalo,* 731 F.2d 878, 885 (Fed.Cir.1984). The ultimate issue of fraud or inequitable conduct remains, however, a matter for the fact finder to evaluate in view of all of the facts and circumstances of the case. 719 F.2d at 1151. In view of this standard, the Court may find fraud on the PTO absent a showing of intentional misconduct provided that there are misstatements which show gross negligence regarding the truth.

In addition to this definition of fraud on the PTO, the burden of proof on this defense is also significant. Parties asserting a defense of fraud on the Patent Office must present "clear and convincing evidence" of misconduct before the PTO. *Kansas Jack, Inc. v. Kuhn,* 719 F.2d 1144, 1151 (Fed.Cir.1983). This burden of proof is significantly higher than the standard preponderance of the evidence standard applicable to the other issues in this litigation. The Court, therefore, will analyze the evidence of fraud in the context of this higher standard.

Fireline has not presented any direct evidence of misconduct by Foseco during the prosecution history of the '199 patent. Instead, Fireline urges the Court to infer intent from other sources. Specifically, Fireline points to defects in Foseco's prior art disclosures concerning the duPont '927 patent, the Kalmin 15 riser sleeve, and the Babcock & Wilcox riser sleeve. In addition, Fireline points toward five specific representations made by Foseco during the prosecution history of the '199 patent which were allegedly intentionally incorrect. The Court must examine these allegations to determine whether Fireline has

presented clear and convincing evidence that Foseco committed fraud on the PTO.

Fireline's initial claims of fraud relate to Foseco's failure to properly disclose prior art references to the duPont '927 patent, the Kalmin 15 riser sleeve and the B & W sprue liner during the prosecution history of the '199 patent. All three of these prior art references teach a binder of colloidal silica and starch. None of these references was disclosed to the PTO during the prosecution history, although Foseco unsuccessfully attempted to include the duPont '927 patent reference on the eve of the '199 patent publication. Given the significance of the starch and colloidal silica sol binder to the '199 patent, disclosures regarding the binder are clearly material to the validity of the '199 patent. The issue which remains, however, is whether Foseco's failure to make these disclosures rises to the level of constituting fraud on the PTO.

Fireline's claims of intentional nondisclosure focus upon an October 23, 1968 patent survey done by Foseco. That survey, which was distributed to the principal Foseco employees and officers involved in the prosecution of the '199 patent, discusses the duPont '927 patent and its starch and colloidal silica sol binder. In addition, Foseco was involved in the sale and distribution of the Kalmin '15 and B & W sprue liners using the starch and colloidal silica sol binder during the mid-1960s. Yet, Foseco did not disclose the duPont patent as a prior art reference until July 26, 1977.

Foseco's response to these allegations takes two directions. Foseco argues that none of these prior art references were particularly material. In addition, Foseco indicates that any failure to disclose these references was the result of an oversight or a good faith judgment that they were not relevant. In light of these contentions, the Court must determine whether Foseco's failure to disclose these references provides clear and convincing evidence that Foseco made intentional misrepresentations to the PTO or was grossly negligent in fulfilling its obligations before the PTO.

Consideration of the significance of the nondisclosure of these prior art references dealing with the colloidal silica and starch binder must be considered in the context of the prosecution history of the '199 patent. Up until 1974, Foseco's attempts to obtain a patent on the Cartwright invention focused upon the use of aluminum in the Kalmin 70 sleeve. Throughout that period, the binder was a minor element in the patent claims. Disclosures regarding the binder, therefore, were of minimal significance. By the time that the prosecution history of the '199 patent shifted to a focus on the binder, the 1968 report was over six years old. As that report contains over 70 references, the significance of the nondisclosure is limited and does not constitute significant proof of an intent to mislead the PTO.

Fireline has also identified five affirmative misrepresentations made by Foseco which Fireline alleges constitute fraud on the PTO. The first alleged misrepresentation was Foseco's failure to disclose that the example 3(a) in the September 23, 1969 application (no. 860,398) was based on the Kalmin 15 sleeve composition. This example contained aluminum and therefore was materially distinguishable from the Kalmin 15 sleeve. There was, therefore, no misrepresentation.

Fireline's second claim of misrepresentation is tied to Cartwright's November 21, 1975, declaration that the subject matter of the C–I–P application was not prior art. That declaration failed to indicate the relationship of the duPont '927 patent to the starch and colloidal silica binder of the Cartwright invention, as well as the British grant of a patent on the Cartwright invention on August 2, 1972. As the application described a combination of ingredients, the fact that it contained the starch and colloidal silica sol binder described in the duPont application does not render Cartwright's declaration inaccurate. Further, in the absence of any evidence of bad faith for the invention, the Court will not consider Cartwright's failure to note the British grant of a patent to be a significant misrepresentation.

The third alleged misrepresentation identified by Fireline is Foseco's description of colloidal silica as a "finely divided silica available as powder from various manufacturers" in its amendment filed July 27, 1976. In fact, the invention can only be practiced when colloidal silica is mixed with water to create a "sol." Given the context in which this representation was made, and the familiarity of the patent examiner with this field, any inaccuracy in the amendment was not material.

The fourth alleged misrepresentation identified by Fireline is the declaration in the January 7, 1977, amendment that the range of aluminum in the Cartwright invention is not taught by Rumbold '667 patent. If allowance is made for percentage of aluminum in "fall mill dust" employed in the Rumbold '667 patent, this representation is possibly not accurate. It does not, however, rise to the level of an affirmative misrepresentation.

The final alleged misrepresentation is Foseco's statement in its July 26, 1977, petition and prior art statement that the du-Pont '927 patent had only recently been brought to Foseco's attention. As discussed earlier, that patent was included in the 1968 internal patent review report done by Foseco. Although there is no evidence that anyone involved in the application process remembered this reference, the representation is technically inaccurate. It does not, however, rise to the level of affirmative misrepresentation.

Based on this analysis, the Court concludes that Foseco's conduct during the patent prosecution history during the '199 patent does not rise to the level of fraud on the PTO.

## II. INFRINGEMENT

Foseco alleges that Steeline riser sleeves infringes the '199 patent both under a theory of literal infringement and under a doctrine of equivalents argument. The traditional definition of literal infringement is found in the Supreme Court's decision in *Graver Tank Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed.

1097 (1950). In that case, the Court stated that

> In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If the accused matter falls clearly within the claim, infringement is made out and that is the end of it.

*Id.* at 607, 70 S.Ct. at 855. Developing this concept further, the Sixth Circuit has stated that

> Every element of a claim charged to be infringed must be found in the accused device and that omission of any one element precludes infringement.

*Graphicana Corp. v. Baia Corp.*, 472 F.2d 1202, 1203 (6th Cir.1973) (citations omitted).

▮ In addition to the claim of literal infringement, Foseco argues that the Steeline sleeve infringes upon the '199 patent under the doctrine of equivalents. The doctrine of equivalents is used to protect patent holders whose patents are copied with sufficient minor variations to prohibit a finding of literal infringement. In order to prevent a fraud on the patent, a court will find infringement if the accused device " 'performs substantially the same function in substantially the same way to obtain the same result.' " *Graver Tank Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (citation omitted). The area of "equivalents" described by the *Graver Tank* Court varies depending upon the subject matter of the patent. "What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case." *Id.* at 609, 70 S.Ct. at 856. Under the doctrine of equivalents, therefore, a patent holder may claim infringement by structures which do not exactly copy the patent.

▮ The scope of equivalents is further limited by "file wrapper estoppel." File wrapper estoppel acts to limit the subject matter outside the claims of a patent which will be presumed to infringe upon the patent. Where the PTO rejects an application including certain subject mat-

ter, and a patent is later granted which does not include that subject matter, file wrapper estoppel acts to prevent the patent holder from reclaiming the deleted subject matter as part of the patent through the doctrine of equivalents. The estoppel does not preclude use of the doctrine of equivalents in all cases where an amendment of the claims has occurred, although it does limit the range of equivalents in such a case. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362–63 (Fed.Cir. 1983). *See also Bayer Aktiengesellschaft v. Duphar International Research B.V.*, 738 F.2d 1237 (Fed.Cir.1984).

As discussed earlier, Fireline used three different recipes for the Steeline riser sleeve. Foseco contends that all three of these recipes infringe upon the '199 patent. As the differences between the individual recipes raise different issues, the Court will separately consider the claims of infringement by each of these three recipes.

### A. *Infringement By The First Recipe.*

The first recipe used by Fireline is discussed in detail earlier in this opinion. *See* pp. 1546–1547, *supra*. Foseco argues that this recipe literally infringes upon claims 1, 2, 4, and 6 of the '199 patent. A table showing the ingredients used in the first recipe and the claims under the '199 patent appears below:

| REFERENCE | ALUMINO-SILICATE FIBERS | ALUMINUM POWDER | ALUMINUM FILLER | BINDER | | |
| | | | | STARCH | COLLOIDAL SILICA | TOTAL |
| Claim 1 | 45–75% | 1–20% | 0–25% | | | 2–16% |
| Claim 2 | 45–75% | 1–20% | 0–25% | | | 2–16% |
| Claim 4 | 45–75% | 1–20% | 0–25% | | | 2–16% |
| Claim 6 | 45–75% | 1–20% | 0% | | | 2–16% |
| First Recipe | 66.4% | 8.9% | 17.1% | 2.1% | 5% | |

A review of this table indicates that the first recipe for the Fireline sleeve contains ingredients within the percentages claimed by claims 1, 2, and 4. As the Fireline sleeve contains 17.1% alumina, and claim 6 does not refer to alumina or any similar substance, the first recipe does not infringe upon claim 6 of the '199 patent.

The lone argument made by Fireline that the first recipe does not infringe upon the '199 patent is that Fireline uses less starch in its recipe than Foseco uses in the Kalmin 70 sleeve. The Kalmin 70 recipes contain 5% ± 2% starch, and the examples included in the specification of the patent reflects starch percentages of 6% and 7%.

The issue of infringement, however, is not evaluated under either of these criteria. The Court must look to the claims of the patent. The claims do not contain any breakdown between the amount of starch and colloidal silica sol used in the binder. As the combined percentage of starch and colloidal silica sol in the first recipe falls within the claims, and the Kalmin 70 sleeve and the examples cited in the specification are not relevant to the determination of literal infringement, the Court finds Fireline's argument is not well taken.

Accordingly, the Court concludes that the Steeline riser sleeve produced by Fireline pursuant to this first recipe literally infringes upon claims 1, 2, and 4 of the '199 patent.

### B. *Second Recipe For Steeline Sleeves.*

As discussed earlier in this opinion, *supra* at 1546–1547, Fireline's second recipe closely paralleled the first recipe. The only significant difference was the addition of P.F. resin, 7.6% by dry weight percentage, to the second recipe. Fireline argues that the addition of this new ingredient takes the second recipe outside the claims of the '199 patent. Foseco argues, in contrast, that the addition of P.F. resin is strictly an "add-on" which does not allow the second recipe to escape infringement.

In evaluating Foseco's claim that P.F. resin is simply an add-on, the Court's analysis begins with the Federal Circuit's decision in *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700 (Fed.Cir.1983) *cert. denied* — U.S. ——, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984). In that case, the Court stated that

It is fundamental that one cannot avoid infringement merely adding elements if each element. recited in the claims is found in the accused device. *See Temco Electric Motor Co. v. Apco Manufacturing Co.*, 275 U.S. 319, 328 [48 S.Ct. 170, 173, 72 L.Ed. 298] (1928). For example, a pencil structurally infringing a patent claim would not become non-infringement when incorporated into a complex machine that limits or controls what the pencil can write.

*Id.* 104 S.Ct. at 703. *See* also *Radio Steel & Manufacturing Co. v. MTD Products, Inc.*, 731 F.2d 840, 848 (Fed.Cir.1984). The issue under this standard, is whether the added elements change the invention itself or simply put the invention as a whole into a different context.

The Court has previously found that P.F. resin has been routinely used as a waterproofing agent for foundry products for many years. Fireline argues that the addition of P.R. resin changes the invention because it performs binding functions. While the P.F. resin performs some incidental binding functions, the Cartwright invention can be practiced without the use of P.F. resin, as it is practiced in England. In view of these factual considerations, the Court concludes that the addition of P.F. resin in the second recipe constituted an "add-on" which does not allow the second recipe to escape infringement.

Under this analysis, the Court concludes that the Steeline sleeves manufactured pursuant to the second recipe infringe upon claims 1, 2, and 4 of the '199 patent.

### C. *Third Recipe For Steeline Sleeves.*

The third recipe for the Steeline sleeve represents a minor modification of the previous recipes. In the third recipe, Fireline replaced Ludox with Wesol FB. Fireline argues that this change takes the third recipe outside the claims of the patent while Foseco argues that Wesol FB is sufficiently similar to Ludox colloidal silica sol that the third recipe constitutes an infringement on the claims of the '199 patent under either a theory of literal infringement or through the doctrine of equivalents.

#### 1. *Literal Infringement.*

As noted earlier, a conclusion of infringement requires a finding that each and every element of a patented claim is found in the accused structure. In this case, Fireline argues that the third recipe for Steeline sleeves does not literally infringe the '199 patent because of the change from Ludox to Wesol FB. In Fireline's view, Wesol. FB is a polysilicate solution and is, therefore, distinguishable from the colloidal silica sol called for in the '199 patent. Foseco attacks this position by arguing that the difference between a polysilicate solution and a colloidal silica sol is one of semantics, not chemistry.

Resolution of this disputed factual issue is complicated by the failure of the experts to clearly identify the differences between a polysilicate solution and a colloidal silica sol.[15] There are differences. Polysilicate solutions have a particle size of approximately .3 nanometers

$$\left(\frac{.3m}{10^9}\right).$$

In contrast, colloidal silica sols have particle size in the vicinity of 10 to 15 nanometers

$$\left(\frac{10-15m}{10^9}\right).$$

As a result, a colloidal silica is an opalescent liquid while a polysilicate solution is clear. Further, a polysilicate solution is

---

**15.** *See e.g. Iler, The Colloid Chemistry of Silica and Silicates* (1955). This failure to draw distinctions is understandable, however, in view of the apparent insignificance of the differences between the properties of polysilicate solutions and colloidal silica sols.

more stable than a colloidal silica sol during handling.

While these differences between Wesol FB and a colloidal silica sol are relatively insignificant in chemical terms, they carry greater consequences in the context of the patent law. To declare literal infringement, the Court must find that Wesol FB is a colloidal silica sol. As noted above, there are differences between Wesol FB and a colloidal silica sol. The Court, therefore, concludes that the third recipe for Steeline sleeves using Wesol FB does not literally infringe upon the '199 patent.

### 2. Doctrine of Equivalents.

Foseco also claims infringement under the doctrine of equivalents. In Foseco's view, Wesol FB performs "substantially the same function and substantially the same way to obtain the same result" as the colloidal silica sol disclosed in the claims. As noted earlier, the technical literature does not recognize a significant difference between a colloidal silica sol and a polysilicate solution. The evidence presented at trial indicates that Wesol FB is an interchangeable substitute for the Ludox colloidal silica sol used by Foseco in the earlier Kalmin 70 recipes. The Wesol FB combines with the starch to form both a low and high temperature binder for the riser sleeves. The technical studies done by plaintiff's expert further indicates that there are no significant differences between the results obtained using a riser sleeve containing Wesol FB and a riser sleeve containing Ludox. The handling advantages resulting from Wesol FB's greater stability are not significant. Under this analysis, the Court finds that Wesol FB is a very close substitute for colloidal silica sol.

This finding, however, does not necessarily lead to a conclusion that the third recipe for the Steeline sleeve infringes upon the '199 patent. Fireline argues that file wrapper estoppel precludes this resort to the doctrine of equivalents. In Fireline's view, the amendments to the application for the '199 patent to reflecting the starch and colloidal silica sol binder preclude any resort to the doctrine of equivalents for a finding of infringement with regard to the binder.

The Court begins with the legal issue of whether file wrapper estoppel precludes any resort to the doctrine of equivalents where an amendment to the claims has been made. That position, which had been the law in a number of circuits, was rejected by the Federal Circuit in *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362 (Fed.Cir.1983). Instead, the Federal Circuit took the view that the effect of file wrapper estoppel varies depending on the nature and purpose of an amendment. The more significant the amendment, the narrower range of equivalents which will be considered. *Id.* at 1363. Under this authority, Foseco may use the doctrine of equivalents to support a finding of infringement.

The Court must now consider the range of equivalents surviving the file wrapper estoppel. The Court notes that the lone difference between the '199 patent and the third recipe for the Steeline riser sleeve is the substitution of Wesol FB polysilicate solution for the colloidal silica sol in the '199 patent. At a minimum, starch, silica, resin, or any combination of these substances could serve as the binder for a riser sleeve. In view of these possibilities, the difference between a polysilicate solution/starch binder and a colloidal silica sol/starch binder is not very great. Upon review of the relatively small limitation reflected by the amendment to the patent, and the closeness of the binder in the third recipe to the patent, the Court concludes that the third recipe for the Steeline riser sleeve infringes upon claims 1, 2 and 4 of the '199 patent.[16]

16. Alternatively, Foseco has argued that the operation of file wrapper estoppel is limited in cases where the amendment was not made to overcome a PTO rejection based on prior art. *See Coulter Electronics v. J.T. Baker Chemical Co.,* 487 F.Supp. 1172, 1174 (N.D.Ill.1980). In this case, the amendment to the claims setting forth the specific starch and colloidal silica sol binder was based upon the 1974 PTO rejection of the no. 429,799 application because of a lack

### III. CONCLUSION

Based on this analysis, the Court concludes that the '199 patent is not valid solely because of a prior use. If the '199 patent is found to be valid by a reviewing Court, the Court finds that the patent is infringed by all three of the recipes for the Steeline riser sleeve manufactured by Fireline.

### ON MOTION FOR NEW TRIAL

The plaintiff has filed a timely [1] motion for a new trial pursuant to the provisions of Rule 59(a)(2) of the Federal Rules of Civil Procedure.[2] The plaintiff contends that the recent decision of the Court of Appeals for the Federal Circuit in *Pennwalt Corp. v. Akzona, Inc.*, 740 F.2d 1573, 222 USPQ 833 (Fed.Cir.1984) mandates a contrary conclusion on the issue of patent validity. *Pennwalt* interprets and modifies the holding of *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 221 USPQ 97 (Fed.Cir.1984), a decision relied upon by this Court in holding the patent invalid.

Based upon the following analysis, the plaintiff's motion is sustained, the judgment of September 19, 1984 is opened, additional fact findings and conclusions of law and a new judgment are entered as hereafter set forth.

In the memorandum opinion filed September 19, 1984, this Court, found Foseco's patent invalid for prior use based upon Foseco's sale of the patented invention between the filing of the original application and the C–I–P application which resulted in the grant of the '199 patent. While recognizing that the patent would survive the prior use challenge if the subject matter in the C–I–P application was inherent in the original application, the Court precluded Foseco from making this argument. Relying upon *Litton*, this Court declared that "the Litton court held that the filing of a C–I–P application raises an irrebuttable presumption that the C–I–P application adds new subject matter." (page 27) Consequently, this Court held that Foseco's filing of a C–I–P application estopped Foseco from arguing that the C–I–P application did not add subject matter which was not inherent in earlier application.

In the *Pennwalt* decision of August 10, 1984, the Federal Circuit limited the scope of *Litton*. Specifically, Judge Miller writing for the Court of Appeals for the Federal Circuit, declared with respect to the *Litton* holding as follows:

> In assessing the validity of the Nemeth patent, we must first decide whether the district court's holding that the Nemeth patent is entitled to only the April 1, 1974, filing date of the parent application, instead of the March 1, 1972, filing date of the grandparent application, is correct. *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1438, 221 USPQ 97, 106 (Fed.Cir.1984).

> In *Litton v. Whirlpool*, 728 F.2d at 1438–40, 221 USPQ at 106–07, this court declined to accord a patent, which issued from a CIP application, the filing date of its parent application (under 35 U.S.C. § 120), because the issuance of a patent from a CIP application, filed in response to a PTO "new matter rejection," estops the patentee from arguing that the PTO's rejection was erroneous. Specifically, Litton was precluded from arguing that claim limitations in the patent which were the basis for a "new matter rejection" in the parent application are inher-

---

of specificity regarding the binder. Under these circumstances, the Court concludes that file wrapper estoppel does not significantly limit the range of allowable equivalents.

1. A motion for new trial must be filed within ten days of the judgment entry. The Court's judgment entry was filed September 19, 1984. The tenth day fell on Saturday, September 29, 1984. The plaintiff's motion for a new trial was filed on the following Monday, October 1, 1984.

2. Rule 59(a)(2) provides that in an action tried without a jury, a new trial may be granted whereby the Court may open the judgment if one has been entered, take conclusions of law or make new findings and conclusions and direct the entry of a new judgment. In the Court's view no additional testimony is required, only a different conclusion.

ent in the disclosure of the parent application, because Litton had acquiesed [sic] in the "new matter rejection" by filing a CIP application which ultimately issued as a patent. *Id.* Having acquiesced in the PTO's position that the claim limitations constituted new matter with respect to the disclosure of the parent application, the claims of Litton's patent were not accorded the filing date of the parent application which was needed to overcome an "on sale" bar under 35 U.S.C. § 102(b). *Id.*

*The filing of a CIP application to overcome a PTO rejection does not, however, give rise to an irrebuttable presumption of acquiescence in the rejection.* Whether claims are entitled to the CIP application's filing date or that of a parent application becomes important when an intervening event occurs which will invalidate the claims under 35 U.S.C. § 102 if they are only accorded the latter filing date. As with any other basis for asserting patent invalidity, Pennwalt has the burden of overcoming the presumption of validity under 35 U.S.C. § 282 (1982) by clear and convincing evidence that the filing of a CIP application and its issuance as a patent constituted an acquiescence by Armak in the PTO's rejection.... Although this burden of proof remains on the party alleging invalidity throughout the trial, once a prima facie case of acquiescence is established, the patentee must come forward with countervailing evidence (citation omitted).

On February 25, 1974, the PTO finally rejected the claims of Nemeth's grandparent application under 35 U.S.C. §§ 103 and 112 (first and second paragraphs). The rejection under section 112 (first paragraph) was based on the specification's lack of an enabling disclosure and failure to set forth a best mode, because the specification only described the encapsulating material as a "polyam-

ide" without setting forth a specific polyamide or a method of preparation. Following this rejection, Armak filed the parent application and abandoned the grandparent application.... Based on this evidence and the fact that Armak ultimately permitted a continuation of the parent application to issue as the Nemeth patent, we are satisfied that a prima facie case of acquiescence was established....

After reviewing the record, it is apparent that Armak presented no evidence rebutting the prima facie case of acquiescence in the PTO's enablement and best mode rejections....

In view of Armak's failure to show that it did not acquiesce, Armak is estopped from asserting that the grandparent application complied with the first paragraph of 35 U.S.C. § 112 in order to gain benefit of that application's March 1, 1972, filing date under 35 U.S.C. § 120. Accordingly, the Nemeth patent is only entitled to the April 1, 1974, filing date of the parent application (emphasis added) (footnote omitted).

*Id.* 740 F.2d at 1579–1580, 222 USPQ at 836–837.

Thus *Pennwalt* removed the irrebuttable presumption required by *Litton* and upon which the Court's earlier opinion was based. Unfortunately, this Court did not have the benefit of the *Pennwalt* analysis at the time the memorandum opinion and judgment entry of September 19, 1984 was published and filed.

 This Court finds that the holding in *Pennwalt* limits [3] *Litton* to situations where there is a "new matter rejection" followed by a C–I–P application. The PTO rejected the parent application because it asserted new matter which needed to be the basis of a new application. As *Litton* did not appeal this new matter rejection, the Court estopped *Litton* from arguing it was not new matter. Accordingly, given

---

**3.** The defendants argue that *Pennwalt* should be limited to its facts and that *Litton* should be construed to state the general rule. This Court disagrees. In this Court's view, *Pennwalt* addresses *Litton* and with precision limits *Litton* to its facts and makes evident for all the proposition that a C–I–P application does not raise an irrebuttable presumption that the C–I–P application adds new subject matter.

the decision in *Pennwalt, Litton* is now distinguishable from the case *sub judice* because Foseco's rejection was based upon prior art.

Given the nature of that rejection and the subsequent ruling in *Pennwalt,* the Court finds, contrary to its initial holding, that Foseco is permitted to argue that it did not acquiesce in a PTO finding new matter and may further argue that the C–I–P application's disclosures were inherent in the parent application.

In the Court's view, the following analysis applies. The defendant, under *Pennwalt,* has the initial burden of proof on the prior use challenge to validity. *Id.* 740 F.2d at 1578, 222 USPQ at 836. The defendant is able to meet its initial burden of proof by asserting a *prima facie* case that the matter was not inherent by showing an initial rejection by the PTO, no challenge to the PTO's action, and the patent holder's subsequent filing of a more detailed C–I–P application. Upon making such a showing of a *prima facie* case, the burden then shifts to Foseco to show that the patent holder has not acquiesced in a finding of new matter by the PTO. *See Pennwalt* 740 F.2d at 1579, 222 USPQ at 837. Only if the plaintiff survives such an inquiry may the Court then move to the factual consideration of the issue of inherency.

With that background the Court turns now to the examination of this case. The file history, most notably the initial rejection by the PTO does not suggest any finding of new matter. In addition, the three page letter submitted on behalf of the plaintiff and dated April 2, 1976, (*see* defendant's exhibit DX–AM, pages 19, 20, 21) and attached hereto as appendix A, clearly demonstrates that Foseco did not agree with any finding of new matter. Under such circumstances, the Court finds no acquiescence in a PTO finding of new matter.

Having concluded that Foseco did not acquiesce with respect to a new subject matter determination, the Court now turns to the issue of inherency with respect to the binder disclosures. In the Court's view, footnote 12 appearing at page 28 of the memorandum opinion of September 19, 1984, addresses the inherency issue and adequately demonstrates the Court's view that the revelation respecting the starch and colloidal silica sol binder, as contained in the C–I–P application is inherent in the parent application. Notably the starch and colloidal silica sol binder was disclosed in all the prior applications' specifications. All that Foseco has done with the C–I–P application is to exclude other potential binders from the scope of the claims.

In sum, based upon the new findings and conclusions of law herein stated, and the previous fact findings and conclusions of law stated in the Memorandum Opinion filed September 19, 1984, not inconsistent with the Court's new findings and conclusions, the Court finds that Foseco's motion for a new trial is well taken and the same is sustained. The Court further finds, based upon the new findings and conclusions of law as supplemented by the previous fact findings and conclusions of law, that a new judgment must be entered finding Foseco's patent in suit to be valid and that the defendants have infringed the patent.

IT IS SO ORDERED.

### APPENDIX

### DEFENDANT'S EXHIBIT DX–AM

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of John
Edward Cartwright

Serial No. 637,522

Filed: December 4, 1975

For: Refractory
Heat-Insulating Materials

Group Art Unit No. 322
### LETTER

Honorable Commissioner of Patents and Trademarks
Washington, D.C. 20231
Sir:

The purpose of this paper is to forward a Declaration submitted under Rule 132 and

to review the prosecution history of the parent application which led to the filing of the present continuation-in-part.

During prosecution of the parent application, Applicant limited most of the claims to a composition containing a binder consisting of a combination of starch and colloidal silica. At an interview held with Examiner Poer in September of 1975, following the receipt of a final rejection of the parent application, Applicant's attorney showed the Examiner samples of two different materials, one prepared with a binder of colloidal silica sol and the other with a binder consisting of a combination of starch and colloidal silica sol. Although the Examiner recognized the dramatic difference in the two products, he objected to the fact that the specification of the application was not limited specifically to binders consisting of starch and colloidal silica and did not emphasize the advantages of this particular binder. Accordingly, Applicant refiled the application with a revised specification limited to a binder consisting of starch and colloidal silica and adding a statement emphasizing the improved results obtained with this particular binder (page 4, 11. 11–16). Of course, these revisions in the specification do not represent new matter because the original application clearly disclosed the use of a binder consisting of starch and colloidal silica. Indeed, every one of the working examples of the original application illustrated the use of a such a binder, which is certainly a strong indication of the preference for this particular binder.

The attached Declaration sets forth the experiments that were conducted by the Assignee of this application to compare products produced with a binder consisting of starch and colloidal silica on the one hand, and only colloidal silica on the other hand. The products produced by the experiments described in this Declaration were subsequently lost or stolen, after which the original preparations were repeated to produce a second set of the same type of products, and it was this second set

of products that was shown to the Examiner at the interview held in September of 1975. The Examiner will recall that the products produced with the binder of starch and colloidal silica exhibited dramatically better integrity and strength than the product produced with a binder of colloidal silica alone.

None of the prior art cited in the course of the prosecution of the parent application disclosed the use of a binder consisting of starch and colloidal silica, much less the vastly improved properties attained by the use of this specific binder. Accordingly, it is submitted that claims 1–7 of the present application, all of which are directed specifically to a binder "consisting of starch and colloidal", are clearly allowable.

Although it is believed to be beyond question that the present application is entitled to the benefit of the filing dates of the parent applications, which date back to September 23, 1969, nevertheless Applicant wishes to inform the Examiner that the parent application was published in Germany in about April of 1970.

It is believed that the information contained herein and the attached Declaration will expedite the Examiner's initial consideration of this application.

Signed at Chicago, in the County of Cook, and State of Illinois, this 2nd day of April, 1976.

Respectfully submitted,
/s/ Stephen G. Rudisill
Stephen G. Rudisill—Reg. No. 20087
Attorney for Applicant
Leydig, Voit, Osann, Mayer & Holt, Ltd.
One IBM Plaza—Suite 4600
Chicago, Illinois 60611
(312) 822–9666
SGR:jp